## WRIGHT *v.* UNITED STATES.

No. 37. Argued November 16, 1937.—Decided January 17, 1938.

*Mr. Ashby Williams,* with whom *Mr. James J. Lenihan* was on the brief, for petitioner.

*Assistant Attorney General Whitaker,* with whom *Solicitor General Reed,* and *Messrs. Henry A. Julicher* and *Paul A. Sweeney* were on the brief, for the United States.

Mr. Chief Justice Hughes delivered the opinion of the Court.

The question is whether Senate Bill 713, 74th Congress, 1st session, which was passed by both Houses of Congress, became a law.

The bill was presented to the President of the United States on Friday, April 24, 1936. It had originated in the Senate. On Monday, May 4, 1936, the Senate took a recess until noon, Thursday, May 7, 1936. The House of Representatives remained in session. On May 5, 1936, the President returned the bill with a message addressed to the Senate setting forth his objections. The bill and message were delivered to the Secretary of the Senate. When the Senate reconvened on May 7, 1936, the Secretary advised the Senate of the return of the bill and the delivery of the President's message.[1] On the same day

---

[1] This communication was as follows:

"United States Senate,
Washington, May 7, 1936.

Hon. John N. Garner,
President of the Senate.

My dear Mr. President:

On Friday, April 24, 1936, the Committee on Enrolled Bills of the Senate presented to the President of the United States the enrolled bills (S. 713) granting jurisdiction of the Court of Claims to hear the case of David A. Wright, and (S. 929) for the relief of the Southern Products Co., which had passed both Houses of Congress and been signed by the Speaker of the House of Representatives and the President of the Senate.

The Senate, at 3: 25 p. m. Monday, May 4, 1936, took a recess until 12 noon on Thursday, May 7, 1936.

During the interim the President of the United States sent by messenger two messages addressed to the Senate, each dated May 5, 1936, giving his reasons for not approving, respectively, Senate bill 713 and Senate bill 929. The Senate not being in session on the last day which the President had for the return of these bills under the provisions of the Constitution of the United States, in order to

586

the President of the Senate laid before it the Secretary's letter and the message of the President of the United States. The message was read and with the bill was referred to the Senate Committee on Claims. No further action was taken.

The bill granted jurisdiction to the Court of Claims•to rehear and adjudicate petitioner's claim against the United States. Accordingly on September 14, 1936, petitioner presented his petition to the Court of Claims. The Government opposed the petition upon the ground that the bill had never become a law and the Court of Claims denied the petition. In view of the importance of the question certiorari was granted. 301 U. S. 681.

The applicable provisions of the Constitution are found in Article I, § 7, Paragraph 2, which provides:

"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the

protect the interests of the Senate, so that it might have the opportunity to reconsider the bills, I accepted the messages, and I now present to you the President's veto messages, with the accompanying papers, for disposition by the Senate.

Sincerely yours,

EDWIN A. HALSEY,
Secretary of the Senate."

Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."

1. The first question is whether "the Congress by their adjournment" prevented the return of the bill by the President within the period of ten days allowed for that purpose.

"The Congress" did not adjourn. The Senate alone was in recess. The Constitution creates and defines "the Congress." It consists "of a Senate and House of Representatives." Art. I, § 1. The Senate is not "the Congress."

The context of the clause itself points the distinction. It speaks of the "House of Representatives" and of the "Senate," respectively. It speaks of the return of the bill, if the President does not approve it, "to that House in which it shall have originated"; of reconsideration by "that House," and, in case two thirds of "that House" agree to pass the bill, of sending it together with the President's objections to the "other House" and, if approved by two thirds of "that House," the bill is to become a law. Provision is made for the taking of the votes of "both Houses" and for the recording of the names of those voting for and against the bill on the Journal "of each House respectively."

Then, after this precise use of terms and careful differentiation, the concluding clause describes not an adjournment of either House as a separate body, or an adjournment of the House in which the bill shall have originated, but the adjournment of "the Congress." It cannot be supposed that the framers of the Constitution did not use this expression with deliberation or failed to appre-

ciate its plain significance. The reference to the Congress is manifestly to the entire legislative body consisting of both Houses. Nowhere in the Constitution are the words "the Congress" used to describe a single House.

To disregard such a deliberate choice of words and their natural meaning would be a departure from the first principle of constitutional interpretation. "In expounding the Constitution of the United States," said Chief Justice Taney in *Holmes* v. *Jennison,* 14 Pet. 540, 570, 571, "every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added. The many discussions which have taken place upon the construction of the Constitution, have proved the correctness of this proposition; and shown the high talent, the caution, and the foresight of the illustrious men who framed it. Every word appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood." See, also, *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 333, 334; *Ogden* v. *Saunders,* 12 Wheat. 213, 316; *Myers* v. *United States,* 272 U. S. 52, 151; *Williams* v. *United States,* 289 U. S. 553, 572, 573.

The argument addressed to the word "their" in the phrase "the Congress by their adjournment," is futile. The argument is that the use of the plural would not be unusual or inappropriate if the reference were to a single House. There is no question that both singular and plural forms are used in the Constitution with reference to each House separately. See Article I, § 3, Paragraphs 2, 4, 5, 6; Article I, § 5, Paragraphs 1, 2, 3. The plural is used in the phrase "their Journal" in the paragraph under consideration. But the question is not whether the use of the plural is inappropriate in referring to a single House or its members. It is sufficient to say that there is certainly no inappropriateness in the use of the

plural in relation to "the Congress" as composed of both Houses, and that use in no way changes the significance of that term.

The phrasing of the concluding clause is entirely free from ambiguity and there is no occasion for construction.

2. The argument to the contrary rests upon the premise that a bill cannot be returned by the President to the House in which it originated when that House during the session of Congress is in recess, and hence that the concluding clause of Paragraph 2 of § 7 of Article I, referring to an adjournment by the Congress, should be rephrased by judicial construction in order to deal with that situation. We think that the premise is faulty and the rephrasing inadmissible.

Paragraph 4 of § 5 of Article I provides:

"Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days, nor to any other Place than that in which the two Houses shall be sitting."

It will be observed that this provision is for a short recess by one House without the consent of the other "during the Session of Congress." Plainly the taking of such a recess is not an adjournment by the Congress. The "Session of Congress" continues.

Here, the recess of the Senate from May 4th to May 7th was during the session of Congress and under that provision. In returning the bill to the Senate by delivery to its Secretary during the recess there was no violation of any express requirement of the Constitution. The Constitution does not define what shall constitute a return of a bill or deny the use of appropriate agencies in effecting the return.

Nor was there any practical difficulty in making the return of the bill during the recess. The organization of the Senate continued and was intact. The Secretary

of the Senate was functioning and was able to receive, and did receive, the bill. Under the constitutional provision the Senate was required to reconvene in not more than three days and thus would be able to act with reasonable promptitude upon the President's objections. There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in presenting a bill to the President by sending it to the White House in his temporary absence. Such a presentation is familiar practice. The bill is sent by a messenger and is received by the President. It is returned by a messenger, and why may it not be received by the accredited agent of the legislative body? To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right.

These practical considerations were well put by Mr. Hatton W. Sumners in his argument as *amicus curiae* on behalf of the Committee on the Judiciary of the House of Representatives in the *Pocket Veto Case,* 279 U. S. 655. He said:

"There is no language in the provision governing this passing of bills between the President and Congress, or any recognized rule of construction which, while permitting the Congress in the first instance to send bills to the President by a messenger, as is done without question, and the President to receive such bills through an appropriate agent even when himself absent from his office; and the President, though he may be away from the Capital, at the time returning the bill by messenger to the Congress, though the Constitution declares 'he,' the President, shall return it, which would prevent the House of origin

from receiving these same bills through a proper agent if
that House were engaged in other business or temporarily
absent from their Chambers. It is against all reason and
every recognized rule of construction, when the avoid-
ance of unnecessary delay is so clearly manifest in the
provision sought to be construed, that a construction
should be superimposed which would make for delay re-
gardless of every desire and of every effort of the Presi-
dent and of the Congress in the situation indicated."

And referring to the provision of the Constitution above
quoted as to adjournments by either House for not more
than three days during the session of Congress, he said:

"In such a situation what is to occur? Is the bill to
become a law despite the objections of the President?
The Congress has not adjourned, and yet the President
cannot make return of the bill to the House of its origin
in session because it is not in session. Is the bill to die
with the Congress in existence, possibly the House of
origin only having adjourned earlier than usual on the
last day permitted for the return of the bill? Is there no
rational construction of the Constitution possible which
will make effective all the safeguards with regard to legis-
lation established in the Constitution, and yet make oper-
ative under every circumstance, the general plan set up
by the Constitution?"

And, again, with respect to the agencies of the Houses
of Congress, Mr. Sumners observed that "The Houses of
Congress have officers and agents of great power and re-
sponsibility who act in their stead, and who are constantly
in their places when the Houses are in session, and when
they are not in session." He found "nothing in the Con-
stitution which denies the right to the use of these agents
in effecting the return of objected-to bills." He added
that

"a rule of construction or of official action which would
require in every instance the persons who constitute the

Houses of Congress to be in formal session in order to receive bills from the President would also require the person who is President personally to return such bills. . . .

"The right of constructive delivery is necessary not only to facilitate legislative procedure, prevent delay, and to hold the President's powers within the limits imposed by the Constitution, but it is also necessary in order to hold the Congress within proper bounds by preventing bills to which the President may object from becoming law without reconsideration by the Congress.

"The adjournment of a House for not more than three days, without the consent of the other House, is not an adjournment of Congress.

"If the Senate should be in executive session, on a matter of the highest public importance, refusing to be interrupted, on the last day of the period in which return may be made, that would not even be an adjournment of one House of the Congress; and yet return could not be made if constructive delivery is not permitted.

"It could not be held that Congress was adjourned when the Senate was in executive session performing its constitutional duty, and the other House in actual session. The sensible thing to do in such a case, would be for the messenger of the President, finding himself unable to make delivery to the Senate, to make the delivery to the Secretary of the Senate. There is nothing in the Constitution to prohibit that being done."

The absence of any practical obstacle to the return of a bill when a House is in temporary recess during the session of the Congress is illustrated by what was done in this instance. The Senate was in recess from May 4th to noon of May 7th. The President's time for consideration expired on May 6th. He delivered the bill with his objections to the Secretary of the Senate on May 5th. The Secretary presented the bill with the President's ob-

jections to the President of the Senate on May 7th and on that day the bill and the objections were laid before the Senate and were referred to the appropriate committee. The fact that Mr. Sumners' contention in the *Pocket Veto Case* was unavailing with respect to the effect of an adjournment of the Congress at the close of its first regular session, in no way detracts from the pertinence and cogency of these observations as addressed to the situation which is now presented.

3. The chief, if not the sole, reliance for the argument that the bill could not be returned by the President during the Senate's recess is our decision in the *Pocket Veto Case, supra.* We do not regard that decision as applicable for two reasons: (1) the present question was not involved, and (2) the reasoning of the decision is inapposite to the circumstances of this case.

In the *Pocket Veto Case*, the Congress had adjourned. The question was whether the concluding clause of Paragraph 2 of § 7 of Article I was limited to a *final* adjournment of the Congress or embraced an adjournment of the Congress at the close of the first regular session. The Court held that the clause was not so limited and applied to the latter. In interpreting the word "adjournment," and in referring to other provisions of the Constitution using the word "adjourn," the Court was still addressing itself to a case where there had been an adjournment by the Congress. The Court did not decide, and there was no occasion for ruling, that the clause applies where the Congress has not adjourned and a temporary recess has been taken by one House during the session of Congress. Any observations which could be regarded as having a bearing upon the question now before us would be taken out of their proper relation. The oft-repeated admonition of Chief Justice Marshall "that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used," and that if

they go "beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision," has special force in this instance. *Cohens* v. *Virginia,* 6 Wheat. 264, 399.

In the *Pocket Veto Case* the Court expressed the view that the House to which the bill is to be returned "is the House in session," and that no return can be made to the House when it is not in session as a collective body and its members are dispersed. But that expression should not be construed so narrowly as to demand that the President must select a precise moment when the House is within the walls of its Chambers and that a return is absolutely impossible during a recess however temporary. Such a conclusion, as we shall presently endeavor to show, would frustrate the fundamental purposes of the constitutional provision as to action upon bills. The Court in the *Pocket Veto Case* was impressed with the impropriety of a delivery of the bill by the President during a period of adjournment "to some individual officer or agent not authorized to make any legislative record of its delivery, who should hold it in his own hands for days, weeks or perhaps months,—not only leaving open possible questions as to the date on which it had been delivered to him, or whether it had in fact been delivered to him at all, but keeping the bill in the meantime in a state of suspended animation until the House resumes its sittings, with no certain knowledge on the part of the public as to whether it had or had not been seasonably delivered, and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid." "In short," said the Court, "it was plainly the object of the constitutional provision that there should be a timely return of the bill, which should not only be a matter of official record definitely shown by the journal of the House itself, giving public, certain and prompt knowledge as

to the status of the bill, but should enable Congress to proceed immediately with its reconsideration; and that the return of the bill should be an actual and public return to the House itself, not a fictitious return by a delivery of the bill to some individual which could be given a retroactive effect at a later date when the time for the return to the House had expired." *Id.*, pp. 684, 685.

These statements show clearly the sort of dangers which the Court envisaged. However real these dangers may be when Congress has adjourned and the members of its Houses have dispersed at the end of a session—the situation with which the Court was dealing—they appear to be illusory when there is a mere temporary recess. Each House for its convenience, and during its session and the session of Congress, may take, and frequently does take, a brief recess limited, as we have seen, in the absence of the consent of the other House, to a period of three days. In such case there is no withholding of the bill from appropriate legislative record for weeks or perhaps months, no keeping of the bill in a state of suspended animation with no certain knowledge on the part of the public whether it was seasonably delivered, no causing of any undue delay in its reconsideration. When there is nothing but such a temporary recess the organization of the House and its appropriate officers continue to function without interruption, the bill is properly safeguarded for a very limited time and is promptly reported and may be reconsidered immediately after the short recess is over. The prospect that in such a case the public may not be promptly and properly informed of the return of the bill with the President's objections, or that the bill will not be properly safeguarded or duly recorded upon the journal of the House, or that it will not be subject to reasonably prompt action by the House, is we think wholly chimerical. If we regard the manifest realities of the situation, we cannot fail to see that a brief recess by one House, such

as is permitted by the Constitution without the consent of the other House, during the session of Congress, does not constitute such an interruption of the session of the House as to give rise to the dangers which, as the Court apprehended, might develop after the Congress has adjourned.

4. The constitutional provisions have two fundamental purposes; (1) that the President shall have suitable opportunity to consider the bills presented to him, and (2) that the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes. *Edwards* v. *United States,* 286 U. S. 482, 486. We should not adopt a construction which would frustrate either of these purposes.

As to the President's opportunity for consideration, we have held that he may still approve bills and that they will become laws, if he acts within the time allotted for that purpose, although Congress meanwhile has adjourned. *La Abra Silver Mining Co.* v. *United States,* 175 U. S. 423; *Edwards* v. *United States, supra.* It is to safeguard the President's opportunity that Paragraph 2 of § 7 of Article. I provides that bills which he does not approve shall not become laws if the adjournment of the Congress prevents their return. *Edwards* v. *United States, supra.*

Where the President does not approve a bill, the plan of the Constitution is to give to the Congress the opportunity to consider his objections and to pass the bill despite his disapproval. It is for this purpose that the time limit for return is fixed. This opportunity is as important as that of the President. But if the return of a bill is impossible during a temporary recess of a House while Congress is in session, either the President may be obliged to cut short the time for his consideration so as to be sure to get his objections before the House while it is within the walls of its Chambers, or, if the President takes the allotted time and attempts to return

the bill during the recess, his objections will either be unavailing or the Congress will be denied opportunity to pass upon them. If, as we think, the concluding words of Paragraph 2 of § 7 are inapplicable then, as Congress has not adjourned, the bill, if not deemed to have been returned, will become a law despite the President's disapproval. Or, if that clause were deemed applicable and the return of the bill be considered to have been prevented by the recess, the bill would not become a law and Congress, although in session, would not be able to pass the bill over the President's objections.

The extremely technical character of the argument which would make impossible the return of a bill because a House has taken a temporary recess is manifest. Suppose the President, who is clearly entitled to his ten days for consideration, sends the bill to the House in which it originated with his objections on the afternoon of the tenth day, but that House has adjourned at noon on that day until the following morning. Then, on the argument now advanced as to the construction of the concluding clause of Paragraph 2 of § 7, the bill would not become a law and the objections of the President would operate practically as an absolute veto although the Congress was in session and ready to consider his objections. Or if that result does not follow, in the view that the clause does not apply because Congress has not adjourned, then, if the bill is not regarded as returned, it becomes a law although the President has shown his disapproval within the ten days. These difficulties disappear if we dispense with wholly unnecessary technicalities as to the method of return and give effect to realities.

We agree with the Government that the precedents of executive action which have been cited are not persuasive. The question now raised has not been the subject of judicial decision and must be resolved not by past uncertainties, assumptions or arguments, but by the applica-

tion of the controlling principles of constitutional interpretation.

We are not impressed by the argument that while a recess of one House is limited to three days without the consent of the other House, cases may arise in which the other House consents to an adjournment and a long period of adjournment may result. We have no such case before us and we are not called upon to conjecture as to the nature of the action which might be taken by the Congress in such a case or what would be its effect.

We hold that where the Congress has not adjourned and the House in which the bill originated is in recess for not more than three days under the constitutional permission while Congress is in session, the bill does not become a law if the President has delivered the bill with his objections to the appropriate officer of that House within the prescribed ten days and the Congress does not pass the bill over his objections by the requisite votes. In this instance the bill was properly returned by the President, it was open to reconsideration in Congress, and it did not become a law.

The judgment is

*Affirmed.*

MR. JUSTICE CARDOZO took no part in the decision of this case.

MR. JUSTICE STONE.

I agree that the legislation now in question did not become a law, not, as the Court holds, because the bill vetoed by the President was returned to the Senate within the ten-day period or to any person authorized to receive the bill in its behalf, but because the Senate by its adjournment prevented the return and thus called into operation the provision that the bill "shall not be a Law" where adjournment prevents its return to the house in

which it originated, within the ten days allowed to the President to sign or disapprove it.[1]

The reasons assigned by the Court for its conclusion seem to me to have no application to the case now before us, and leave in confusion and doubt the meaning and effect of the veto provisions of the Constitution, the certainty of whose application is of supreme importance.

Nothwithstanding the cogently reasoned ruling of a unanimous court in the *Pocket Veto Case*, 279 U. S. 655, 682, that the "House" to which a bill is to be returned by the President means a house in session, we may assume for present purposes that each house of Congress, by appropriate action, may constitutionally confer upon its secretary, clerk, or some other officer, authority to receive a bill returned to it by the President. But it does not appear that any such authority has ever been conferred on the secretary of the Senate, or that he has hitherto assumed to act in that capacity. In the *Pocket Veto Case* this Court held that in 1926 it had not; and

---

[1] Article I, § 7, Cl. 2, of the Constitution reads as follows:

"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."

the Senate has since taken no step in that direction, perhaps because of our dictum in that case that such action would be unconstitutional.

The houses of Congress, being collective bodies, transacting their routine business by majority action, are capable of acting only when in session and by formal action recorded in their respective journals, or by recognition, through such action, of an established practice. Since the foundation of the government it has been the settled usage of both houses of Congress to receive messages from the President and bills disapproved and returned by him, when in session. It does not appear that in the past the secretary of the Senate or any other person has assumed to act for either house in receiving a bill returned by the President, and in one recorded instance the secretary of the Senate and its President declined so to act.[2] There has been no action and no usage of either house recognizing the existence of such authority in any one. *Pocket Veto Case, supra,* 682 *et seq.*

The secretary of the Senate is appointed by that body to serve at its pleasure, and his duties are prescribed by the Senate rules. They give no hint that among these duties is the important function of acting as the Senate in the receipt of bills returned to it by the President during the ten-day period, or retaining them in custody pending its reassembly when the return is during an adjournment. Not only have both houses of Congress failed to designate any person to receive bills returned to them by

---

[2] On May 19, 1888, President Cleveland attempted to return a bill to the Senate during an adjournment, by tendering it to the secretary and to the President of the Senate. Both officers rejected the tender, "claiming that the return of said bill and the delivery of said message could only properly be made to the Senate when in actual session." President Cleveland's message, Senate Journal, 50th Cong., 1st Sess.

the President, but in one instance they explicitly refused to take such action when it was proposed.[3]

The conclusion seems inescapable that whatever constitutional power the Senate and House may possess to designate an officer to receive in their behalf bills returned by the President, they have not exercised it; the Constitution, which directs that bills shall be returned to the house in which they originate, has made no such designation, and neither the Constitution nor any statute, rule or usage has indicated any person who could so act, or prescribed for anyone duties embracing such a function.

In such circumstances delivery of a bill to the secretary of the Senate during its adjournment would seem to be no more a compliance with the constitutional requirement than would its deposit by the President's messenger with the sergeant-at-arms, a doorkeeper, or any other person not clothed with authority or charged with official duty in the premises, who might be induced to receive the bill and undertake to bring it to the attention of the Senate upon reassembly.[4]

Doubts as to the scope and effect of the rule now announced by the Court are multiplied by the intimation that a different rule may be applied in the case of adjourn-

---

[3] In 1868 a bill reported by the Senate Judiciary Committee and passed by majority vote of the Senate, provided for a return of a bill to a house not sitting by delivery of it at the office of the secretary of the Senate or of the clerk of the House, as the case might be. Strong opposition to the bill developed in Senate debate, the bill was not reported out of the Judiciary Committee of the House, and failed of passage. *Pocket Veto Case, supra,* 686 *et seq.*

[4] The fact that the Senate has taken pains to confer express authority in some instances, by formal resolution, Gilfry, Precedents, 226, 462, by rule, Senate Manual, 1936, 5, 8, 12, 36, or by standing order, *id.* at 128 *et seq.*, persuades that the important power to receive a bill would not be conferred *sub silentio,*

ment of either house of Congress, with the consent of the other, for more than three days, and that the present decision can, in some way not disclosed, be distinguished from our ruling in the *Pocket Veto Case,* where the return of a bill to the Senate was held to have been prevented by the adjournment of the Senate, pursuant to concurrent resolution, from July 3rd to November 10th, the House having at the same time adjourned *sine die.* But such an intimation can rest on nothing more substantial than our unwillingness to face the obvious consequences of what is now decided. If it be said that an essential difference between the present case and the *Pocket Veto Case* lies in the fact that here the President delivered the bill with his veto message to the secretary of the Senate, and that there he retained it without signing, then the rule which is now announced will, for all practical purposes, expire with its birth. We can hardly assume that a President would invite further Congressional action by a return of a bill with his veto to a secretary or other officer of the house concerned, during its adjournment, if by retention of the bill without signing, he could make the veto absolute.

Again, if it be said that a distinction is to be drawn between adjournment of one house for three days and longer adjournments taken with the concurrence of the other house, no plausible reason can be advanced for saying that the secretary or any other officer of the Senate possesses authority to receive returned bills during a three-day adjournment which he does not possess during a four-day or longer adjournment during a session of Congress. In the *Pocket Veto Case* the Senate adjourned during a session of Congress for four months, the House consenting, but the ten days allowed for consideration of the bill by the President expired the day after adjournment. If the decision in that case is to stand with this it can only be because the secretary in the former lost on the day after

adjournment an authority which he retained for a day after adjournment in the latter. If lost, it was either because the adjournment was for longer than three days and was thus one which could not be effected without a concurrent resolution, or because the other house had not remained in session. Such distinctions find as little support in Constitution, laws and Congressional practice, and in reason, as does the proposition that the secretary of the Senate is, by virtue of his appointment as such, clothed with authority to receive in its behalf bills returned by the President.

If in the *Pocket Veto Case* the secretary of the Senate, where the bill originated, had authority after adjournment during the session, to receive it in behalf of the Senate, the adjournment did not prevent the return by the President, and the bill, upon his failure to sign or return it, became law by virtue of the constitutional provision just as did some 173 other bills which, until this moment, have been regarded as dead letters, as they were declared to be in the *Pocket Veto Case, supra,* 691.[5] If

---

[5] A memorandum prepared in the office of the Attorney General and transmitted by the President to Congress in 1927, H. Doc. No. 493, 70th Cong., 2d Sess., cites more than 400 bills and resolutions which were passed by Congress and submitted to the President less than ten days before final or interim adjournment of Congress, which were not signed by the President or returned with his disapproval. Of these, 119 were instances in which the adjournment was for a session of Congress as distinguished from its final adjournment. None of these bills or resolutions were placed upon the statute books or treated as having become a law. No attempt appears to have been made to enforce them in the courts, except the law involved in the *Pocket Veto Case.* It does not appear that in any of these instances either house of Congress has taken any official action indicating that in its judgment any of these bills became laws. See the *Pocket Veto Case, supra,* 690, 691. Examination of the House Calendars shows that in the period since that covered by the Attorney General's memorandum, 54 bills have been pocketed before the end of a Congress with no attempt to return them. This was done twice

the Court was wrong on that point, its decision was wrong, and in the interests of a definite and precise constitutional procedure in a field where definiteness and precision are of paramount importance, it should now be frankly overruled.

If I am wrong in my conclusion that the President did not in this case return the bill to the Senate by returning it to its secretary during adjournment, then adjournment did not prevent its return, the President's veto became effective, and there is no occasion for the Court to indulge in an academic discussion of what may in other circumstances be the effect of an adjournment alone of the house in which a bill originates, which actually prevents such a return. The pronouncement now made that the President may be so deprived of the veto power ought to be avoided not only because, in my opinion, it is an erroneous interpretation of the Constitution which may have grave consequences, but because it is unnecessary to the decision. If the experience of one hundred and fifty years' of constitutional interpretation has taught any lesson, it is the unwisdom of making solemn declarations as to the meaning of that instrument which are unnecessary to decision. They can serve no useful purpose and their only effect may be to embarrass the Court when decision becomes necessary. *O'Donoghue* v. *United States,* 289 U. S. 516, 550; *Humphrey's Executor* v. *United States,* 295 U. S. 602, 626–627. The declaration now made, for the first time, that the Constitution has left an undefined area in which the veto power cannot be

in the Seventy-first Congress, once in the Seventy-second Congress, twenty-eight times in the Seventy-fourth Congress, and twenty-three times in the First Session of the Seventy-fifth Congress. See also Veto Messages: Record of Bills Vetoed and Action Taken Thereon by the Senate and House of Representatives, Fifty-first Congress to Seventy-fourth Congress, Inclusive, 1889–1936, compiled under the direction of Edwin A. Halsey, Secretary of the Senate (1936).

exercised, is the more unfortunate since, in the circumstances, it seems almost certain that the Court will be called upon to reëxamine it.

If, on the other hand, I am right in my view that the President was here prevented from returning the bill, we are brought unavoidably to the decision of the question presented by the petition for certiorari and argued at the Bar as the controlling question, whether the President is deprived of the veto power whenever return of a bill within the prescribed ten days is prevented by the adjournment alone of the house in which the bill originated.

The framers, in seeking to establish and preserve the presidential veto, were aware that the originating house, unlike the President who is without incentive to avoid receipt of a bill which he is free to veto, might have the strongest motives to avoid the veto of a bill, if that were possible, by preventing its return or by challenging the fact of its return. They accordingly took care to provide for the return of a bill to the originating house by an act of public notoriety—its delivery to the house in session; and recognizing that return might be prevented by adjournment, they declared that in that case it should not become a law.

The possibility that a return may be prevented by the adjournment of a single house during a session of Congress is not removed by deciding that a secretary or some other officer of the originating house may receive a returned bill during the period of a three-day adjournment. Either house may and does on occasion adjourn for longer periods, with the consent of the other.[6] An adjournment coincident with death or absence of the officer may prevent the return. Whatever authority in the premises the Senate or the House may give to its officer, it may

[6] Cannon, Precedents, Vol. 8, p. 816.

withhold or withdraw. If the dictum now pronounced correctly states the fundamental law, the originating house may shorten the period for the exercise of the veto power or thwart it altogether by the simple expedient of adjournment after withdrawing the supposed authority of any officer to receive the vetoed bill.

This Court has emphasized, as does the language of the Constitution, the great importance of the veto power and the dominating purpose expressed in the constitutional provision that the power shall not be curtailed or the ten days, allowed for its exercise, shortened. *Edwards* v. *United States*, 286 U. S. 482, 486, 493–494; *Pocket Veto Case, supra,* p. 678. The words make it certain that the only adjournment which can prevent return of a bill by the President is that of the house in which the bill originates and to which, if vetoed, it is to be returned. Continuance in session of the other house does not facilitate return. No more can its adjournment obstruct return. Adjournment by the originating house can alone have the consequence to be guarded against, prevention of return. Hence, it was adjournment of the originating house with which the framers were concerned. There is no reason of which we are aware, and none has been suggested, for supposing that in creating and protecting the veto power they regarded the adjournment *vel non* of the non-originating house as of any consequence, or that they had any thought of leaving the President stripped of the veto power, either by chance or by design, whenever the originating house adjourned without the other. The men who created the framework of our government are not lightly to be charged with such an omission. The charge now made finds its only support in a punctilio of grammar.

". . . we must never forget, that it is a constitution we are expounding." *McCulloch* v. *Maryland*, 4 Wheat. 316, 407. Its provisions are not to be interpreted like those of a municipal code or of a penal statute, though

even the latter is to be read so as not to defeat its obvious purpose, *United States* v. *Raynor, ante,* p. 540, or lead to absurd consequences. *United States* v. *Katz,* 271 U. S. 354, 362. In defining their scope something more is involved than consultation of the dictionary and the rules of English grammar. They are to be read as a vital part of an organic whole so that the high purpose which illumines every sentence and phrase of the instrument may be given effect in a consistent and harmonious framework of government.

The Court has hitherto consistently held that a literal reading of a provision of the Constitution which defeats a purpose evident when the instrument is read as a whole, is not to be favored. The phrase "due process" in the Fifth and Fourteenth Amendments has long since been expanded beyond its literal meaning of due procedure. See *Davidson* v. *New Orleans,* 96 U. S. 97; cf. Brandeis, J., concurring in *Whitney* v. *California,* 274 U. S. 357, 373. The term "contract" in the contract clause is not confined literally to the contracts of the law dictionary. *Dartmouth College* v. *Woodward,* 4 Wheat. 518. The prohibition against their impairment has never been taken to be inexorable. *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, and cases cited at 430 *et seq.* The injunction that no person "shall be compelled in any Criminal Case to be a witness against himself" is not literally applied. *Brown* v. *Walker,* 161 U. S. 591, 595. "From whatever source derived," as it is written in the Sixteenth Amendment, does not mean from whatever source derived. *Evans* v. *Gore,* 253 U. S. 245. See, also, *Robertson* v. *Baldwin,* 165 U. S. 275, 281, 282; *Gompers* v. *United States,* 233 U. S. 604, 610; *Bain Peanut Co.* v. *Pinson,* 282 U. S. 499, 501; *United States* v. *Lefkowitz,* 285 U. S. 452, 467.

But here, regardless of the constitutional purpose and the larger considerations which have usually guided our interpretation of the Constitution as an instrument of

608

government, it is insisted that the phrase "unless the Congress by their Adjournment prevent its Return" cannot be taken to include the adjournment alone of the single house whose adjournment is in every case the only effective means of preventing a return. It is said that the word "Congress" used to describe the body whose adjournment occasions the pocket veto, followed as it is by the plural possessive pronoun "their," can refer only to the two houses comprised in "the Congress" and hence cannot refer to adjournment of a single house. This subordination of the framers' main objective to a meticulously grammatical interpretation of their words is unwarranted. It would hardly be suggested that the command, "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy," (Art. I, § 5, cl. 3) calls for the concurrence of the judgment of all the members of a house, in order to ban publication of a journal: "their Judgment" is obviously that of the controlling part of the membership—that part whose opinion, under applicable rules of congressional procedure, is decisive of the question. A similar analysis based on the purpose and context of the clause now before us demands recognition that the draftsmen were concerned with the adjournment only of that part of the Congress to which return was to be made and whose absence would thus prevent return of a bill by the President. In the light of these dominant facts it seems plain that in using the words "their Adjournment" the framers referred to any action taken by the members of Congress of either house or both houses, which was effective to prevent return of a bill by the President to the originating house. The very force of the circumstances to which the words are applied gives emphasis to "Adjournment" as that which prevents return, and to "their" as referring to the action of those members of Congress which effects

the adjournment. This usage parallels that in the clause requiring the publication of the journals of both houses "excepting such Parts as may in their Judgment require Secrecy." In both instances the significant action, adjournment or the exercise of judgment as the case may be, is that of those members whose action is effective to accomplish the contemplated result—there, prohibition of publication; here, prevention of return to the originating house. Thus read, no word is without appropriate meaning and the clause is consistent both with the obvious purpose and with the grammatical usage appearing elsewhere in the Constitution.

I cannot ignore that purpose and say that for no discernible reason other than our present-day notions of grammatical construction we are compelled to read the words as excluding from the operation of the clauses designed to protect the veto power, every case where the return of a bill is prevented by adjournment of a single house.

MR. JUSTICE BRANDEIS concurs in this opinion.