Carl T.C. GUTIERREZ, Governor; Y'asela A. Pereira; Government of Guam; Does 1 through 10, Petitioners,

v.

Vicente C. PANGELINAN, Senator; Joseph C. Wesley, Mayor, on behalf of themselves and all those similarly situated, Respondents.

No. CIV.00–70447.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 2001

Filed Jan. 10, 2002

Eric A. Heisel, Hagatna, Guam, for the petitioners.

Stephanie G. Flores, Michael F. Phillips, Phillips & Bordallo, Hagatna, Guam, for the respondents.

Samuel J. Taylor, Hagatna, Guam, for the amicus.

Before: B. FLETCHER, CANBY, and PAEZ, Circuit Judges.

PAEZ, Circuit Judge:

At the end of the 24th Guam legislative session, the Legislature passed Substitute Bill No. 495 ("Bill 495") and adjourned. The bill was presented to Governor Carl T.C. Gutierrez during the Legislature's adjournment, and he neither vetoed nor signed it. Instead, he returned the unsigned bill to the Legislature stating that he "allowed[] Bill No. 495 to go into law without benefit of the signature of the Governor." Opponents of Bill 495, Senator Vicente C. Pangelinan and Mayor Joseph C. Wesley, brought this action in the Superior Court of Guam against the Governor, Treasurer Y'Asela A. Pereira and the Government of Guam, seeking a declaration that Bill 495 did not lapse into law and an injunction against implementation and enforcement of its provisions. Plaintiffs argued that the Legislature's failure to adopt procedures for receiving gubernatorial messages during its adjournment resulted in a "pocket veto." The superior court rejected Plaintiffs' arguments and entered judgment for Defendants, upholding the validity of the bill.

On appeal, the Supreme Court of Guam reversed. *Pangelinan v. Gutierrez*, 2000 Guam 11, 2000 WL 263216, at *9 (Guam Mar. 10, 2000). The court held that under section 19 of the Organic Act of Guam (codified at 48 U.S.C. § 1423i), the Legislature's failure to adopt adequate procedures

for receipt of gubernatorial messages before it adjourned resulted in a pocket veto, despite the Governor's intent to allow Bill 495 to become law without his signature. The Guam Supreme Court also held that subsequent duly-enacted laws did not ratify Bill 495.

We conclude, as an initial matter, that the Governor has Article III standing to seek relief in this court. On the merits, we agree with the Guam Supreme Court that there was a pocket veto of Bill 495 and that the bill was not ratified. Accordingly, we affirm.

## I.

### Background

#### A.

*Bill 495*

On February 7, 1998, the 24th Guam Legislature passed Bill 495, with 11 votes in favor and 10 votes opposed. Bill 495 contained provisions meant to update Guam's Solid Waste Management Plan. A rider attached to Bill 495 reorganized the judicial branch of Guam's government. Later that day, the Legislature adjourned.

On February 10, 1998, Bill 495 was presented to Governor Gutierrez. On February 22, 1998, the Governor sent the bill, unsigned, to the Speaker of the Legislature. In a letter accompanying the bill, the Governor indicated he was allowing Bill 495 to lapse into law without his signature. The Legislature received the letter on the following day. The record does not reflect who received the letter.

The Legislature reconvened on February 26, 1998, nineteen days after it had adjourned. As of March 12, thirty days after Bill 495 had been presented to the Governor, he had not signed it.

The Legislature subsequently enacted two laws, both signed by the Governor, that referred to Bill 495 as a public law,[1] that is, as an enacted law.

#### B.

*Legal Challenge*

On March 18, 1998, Vicente Pangelinan, one of the ten senators who had voted against Bill 495, and Joseph Wesley, the mayor of Santa Rita, Guam, filed suit in the Superior Court of Guam, seeking a declaration that Bill 495 had not been duly enacted and an injunction enjoining its implementation. The complaint named Guam's Governor and Treasurer and the Government of Guam as defendants. The complaint alleged that the Guam Legislature, by adjourning and failing to properly designate an agent for receipt of the Governor's veto or signed bill, had "prevent[ed]" Bill 495's return by the Governor within the meaning of § 1423i; therefore, under § 1423i, the Governor's inaction resulted in the pocket veto of Bill 495.

In the superior court, Defendants challenged Plaintiffs' standing to bring this action. Defendants also challenged Plaintiffs' interpretation of § 1423i, arguing that the Governor's inaction had the effect of permitting Bill 495 to pass into law. The superior court determined that Plaintiffs had taxpayer standing under title 5, section 7103 of the Guam Code. Addressing the merits, the superior court identified the central question as "whether ... the Legislature authorized an appropriate agent for the return of bills when they adjourned on February 7, 1998." The superior court held that the Legislature had authorized an appropriate agent and therefore had not "prevented" the return of Bill

---

1. Bill 495 was subsequently designated as Public Law No. 24–139.

495. The superior court entered judgment for Defendants.

The Guam Supreme Court reversed. *Pangelinan*, 2000 WL 263216, at *9. Rejecting the superior court's reasoning, the Guam Supreme Court concluded that the Legislature had not established adequate procedures for the return of bills during its adjournment. *Id.* at *6. Thus, the Governor's failure to sign Bill 495 resulted in a pocket veto. *Id.* The Guam Supreme Court also rejected Defendants' alternative argument that, by acknowledging Bill 495 as a law in later enactments, the Legislature had ratified the bill. *Id.* at *8. Defendants then sought rehearing en banc, which the Guam Supreme Court denied. Defendants filed a petition for writ of certiorari with this court, which we granted.

## II.

### *Discussion*

■ We have the authority to review decisions of the Guam Supreme Court under 48 U.S.C. § 1424–2. However, we must first address the threshold question of whether the Governor has Article III standing to pursue this petition in federal court.

### A.

### *Standing*

It is doubtful that Plaintiffs would have had standing to seek relief in federal court at the outset of this case. Defendants, on the other hand, allege sufficient injury from the Guam Supreme Court's ruling to confer standing in this court.

■ As the Superior Court of Guam noted, state courts (and by extension, territorial courts) are not bound by Article III requirements and in state courts "standing is a self-imposed rule of restraint." Relying on a special provision of the Guam Code that confers broad taxpayer standing, the court held that Senator Pangelinan and Mayor Wesley had standing to bring this action in the territorial courts of Guam based solely on their status as taxpayers and on the fiscal effect of Bill 495. Taxpayer status alone ordinarily does not confer Article III standing to challenge general exercises of governmental power. *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 479, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The record discloses no other basis for Plaintiffs' standing.

This does not end the standing inquiry, however. The Governor contends that his Article III standing stems from his allegations of injury from the Guam Supreme Court's decision. We agree.

In *ASARCO Inc. v. Kadish*, the United States Supreme Court addressed an analogous situation arising from its review of the final decision of a state's highest court. 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). The plaintiffs in *ASARCO* brought a civil action in the Arizona courts, which, the United States Supreme Court concluded, the plaintiffs would not have been able to bring in the first instance in federal court. 490 U.S. at 616–17, 109 S.Ct. 2037 ("Our review discloses no basis on which to find that respondents would satisfy the requirements for federal standing articulated by our precedents.... [T]he suit would have been dismissed at the outset were the federal rule to apply."). The plaintiffs prevailed in the Arizona Supreme Court.

The defendants, petitioners before the United States Supreme Court, argued that the decree of the state's highest court had created an injury cognizable in federal court, although none had existed before the state court proceedings were complete.

The Supreme Court agreed. *Id.* at 617–18, 109 S.Ct. 2037.

The Court explained that what matters is whether "the parties first invoking the authority of the federal courts" can establish each prong of the constitutional standing requirements at the time federal court jurisdiction is invoked. *Id.* at 618–19, 109 S.Ct. 2037. Summarizing its holding, the Court stated:

> When a state court has issued a judgment in a case where plaintiffs in the original action had no standing to sue under the principles governing the federal courts, we may exercise our jurisdiction on certiorari if the judgment of the state court causes direct, specific, and concrete injury to the parties who petition for our review, where the requisites of a case or controversy are also met.

*Id.* at 623–24, 109 S.Ct. 2037.

■ For purposes of determining whether a case or controversy exists here, it does not matter then whether Plaintiffs could have met federal standing requirements at the time they brought this civil action in the territorial courts of Guam.[2] Rather, we have jurisdiction if Defendants allege a specific injury from the decision of the Supreme Court of Guam.

■ We conclude that the Guam Supreme Court's decision causes a sufficiently "direct, specific, and concrete injury" to Governor Gutierrez to establish his standing to bring this petition.[3] Our conclusion

follows from the Supreme Court's decisions in *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), and *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). In *Coleman,* members of the Kansas Senate brought a civil action challenging the legitimacy of a resolution that had been passed by the Senate by one vote. The plaintiffs argued that their votes should have been sufficient to defeat the resolution, and that the resolution had passed only because, contrary to law, the Lieutenant Governor of Kansas had cast a tie-breaking vote. The United States Supreme Court held that the plaintiffs had standing because they had a "plain, direct and adequate interest in maintaining the effectiveness of their votes." 307 U.S. at 438, 59 S.Ct. 972. The Court explained that, "[h]ere, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification." *Id.* "They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege." *Id.*

In *Raines,* the Supreme Court explained that the critical fact in *Coleman* was that if the plaintiff-senators were correct on the merits, their votes should have been sufficient to effect a particular result (defeat of the resolution); but the allegedly illegal

---

**2.** The parties have not asked that we review the superior court's determination that Guam territorial law supported Plaintiffs' standing in Guam's superior courts at the outset. (Indeed, it is not clear from the record before us whether that issue was raised on appeal to the Guam Supreme Court.) Thus, although we have jurisdiction under 48 U.S.C. § 1424–2 to review issues of local territorial law, *see infra,* Plaintiffs' standing to bring an action in the territorial courts of Guam is not before us and

we need address only whether Defendants have constitutional standing to seek relief in this court.

**3.** The standing of the Governor is sufficient to sustain jurisdiction; we need not address the standing of the other defendants. *See Legal Aid Soc'y of Alameda County v. Brennan,* 608 F.2d 1319, 1334 (9th Cir.1979).

act instead effected the opposite result (certification of the resolution). 521 U.S. at 822–23, 117 S.Ct. 2312. As summarized by *Raines*, the "holding in *Coleman* stands ... for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at 823, 117 S.Ct. 2312.

For purposes of standing, Governor Gutierrez's position in this litigation is analogous to that of the senators in *Coleman*. He argues that § 1423i granted the Governor the power to allow Bill 495 to pass into law by neither signing nor vetoing it. The Guam Supreme Court's ruling, however, had the opposite effect: the Governor's inaction, in light of the legislature's failure to adopt appropriate procedures for receipt of the bill from the Governor, resulted in a pocket veto of Bill 495. Under *Coleman* and *Raines*, the nullification of Governor Gutierrez's asserted prerogative establishes his standing.

### B.

*Appellate Jurisdiction and Scope of Review*

■■■ For the first fifteen years following the establishment of the Supreme Court of Guam, this court has "jurisdiction to review by writ of certiorari all final decisions of the highest court of Guam from which a decision could be had."[4] 48

U.S.C. § 1424–2. Under § 1424–2, we have jurisdiction not only over federal issues, but over local issues as well. *Id.* In exercising this discretionary power of review, it is evident that we must balance the temporary power of oversight that Congress has given us with Congress's clear intent "to allow Guam to develop its own, independent institutions." *EIE Guam Corp. v. Supreme Court of Guam*, 191 F.3d 1123, 1127 (9th Cir.1999).

■■■ Accordingly, we review decisions of the Guam Supreme Court that bear on local law differently from those that interpret federal law. We have adopted a deferential standard of review for Guam Supreme Court decisions examining local law, that is, decisions that interpret laws enacted by the Guam Legislature or develop Guam's common law. *Id.* Thus, ordinarily we will affirm the Guam Supreme Court's interpretation of a Guam statute "where ... the Guam Supreme Court appears to have construed [the] statute reasonably and fairly." *Id.*

■■■ Our review of the Guam Supreme Court's interpretation of Guam's Organic Act calls for a slightly different analysis. Because Guam's Organic Act is an Act of Congress, interpretations of that Act are subject to *de novo* review. *Ada v. Gov't of Guam*, 179 F.3d 672, 676 (9th Cir.1999), *rev'd on other grounds, Gutierrez v. Ada*, 528 U.S. 250, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000). Although our review is *de novo*, we consider fully the Guam Supreme

4. This petition falls within the fifteen year period. In 1984, Congress enacted 48 U.S.C. § 1424–1(a), which authorized the Guam Legislature to create a local appellate court. Act of Oct. 15, 1984, Pub.L. 98–454, 98 Stat. 1742. Shortly thereafter, the Guam Legislature drafted a statute authorizing the creation of the Supreme Court of Guam. *See* Comment, 7 Guam Code Ann. § 1101 (statutes creating Supreme Court drafted in 1985).

However, the Supreme Court of Guam did not begin to hear cases until rules for the court were established, the Justices were sworn in, and the Chief Justice certified that the court was ready to undertake its responsibilities, a process that only recently was completed. *See In re Habib*, 1996 Guam 7, 1996 WL 924521, at *3 (1996) ("the Supreme Court did not yet exist" in 1994).

Court's explication of legal issues of unique concern to Guam. The Organic Act, as we have recognized, "serves the function of a constitution for Guam," *Haeuser v. Dep't of Law, Gov't of Guam*, 97 F.3d 1152, 1156 (9th Cir.1996), and the congressional promise of independent institutions of government would be an empty one if we did not recognize the importance of the Guam Supreme Court's role in shaping the interpretation and application of the .Organic Act.

## C.

### *Merits*

### 1. *Pocket Veto*

■ At the heart of this controversy is the Governor's contention that, through his deliberate inaction, Bill 495 passed into law pursuant to § 1423i. We reject the contention.

The rules for presentment of a bill to the Governor of Guam for consideration are set forth at 48 U.S.C. § 1423i:

Every bill passed by the legislature shall, before it becomes a law, be entered upon the journal and presented to the Governor. If he approves it, he shall sign it, but if not he shall, except as hereinafter provided, return it, with his objections, to the legislature within ten days (Sundays excepted) after it shall have been presented to him. If he does not return it within such period, it shall be a law in like manner as if he had signed it, *unless the legislature by adjournment prevents its return*, in which case it shall be a law if signed by the Governor within thirty days after it shall have been presented to him; otherwise it shall not be a law.

(emphasis added). When the Governor returns a veto message, § 1423i provides a procedure whereby the legislature can override the veto: "the legislature shall enter his objections at large on its journal and, upon motion of a member of the legislature, proceed to reconsider the bill. If, after such reconsideration, two-thirds of all the members of the legislature pass the bill, it shall be a law."

Thus, when the Guam Legislature presents a bill to the Governor, ordinarily inaction by the Governor results in the bill becoming a law. 48 U.S.C. § 1423i. If, however, the Legislature "by adjournment prevents [a bill's] return," the Governor's inaction is treated as a pocket veto. *Id.* The proper resolution of this controversy turns on whether the Guam Legislature "by adjournment prevent[ed] [Bill 495's] return."

We previously have suggested that, if the Guam Legislature makes "appropriate arrangements . . . for the receipt of [gubernatorial] messages during the adjournment," adjournment will not prevent a bill's return. *Bordallo v. Camacho*, 520 F.2d 763, 764 (9th Cir.1975) (quoting *Kennedy v. Sampson*, 511 F.2d 430, 437 (D.C.Cir.1974)) (internal quotation marks omitted). In *Bordallo*, we noted that the Guam Legislature had "failed to designate an officer to receive messages from the Governor" and failed to "provide for the receipt, filing, routing, and safekeeping of such messages as might be delivered to the Legislature during a recess." *Id.* at 764. Therefore, we concluded that appropriate arrangements had not been made. *Id.* at 764–65. We emphasized that, "in view of the ease with which the Guam Legislature could have made such provisions if it thought the prospect of a pocket veto to be undesirable," our decision in no way impeded the Legislature from avoiding pocket vetoes in the future. *Id.* at

765.[5]

Following the principles recognized in *Bordallo*, the Guam Supreme Court concluded that the Guam Legislature had not adequately "designate[d] an officer to receive messages from the Governor" nor "provide[d] for the receipt, filing, routing, and safekeeping of such messages as might be delivered to the Legislature." *Pangelinan*, 2000 WL 263216, at *3–4, 5–6. We agree.

When the Guam Legislature adjourned on February 7, 1998, the Guam Code specifically authorized the Legislative Secretary to receive messages from the Governor during some legislative recesses. In contrast, it did not provide similar authorization during an adjournment of the Legislature. 2 Guam Code Ann. § 1118(b) & (c) (1998).

The Legislature's standing rules provide no firmer ground for the Governor's argument. During the legislative session in question, the standing rules did provide generally that "[a]ll communications, petitions and messages addressed to the Legislature shall be delivered to the Legislative Secretary, who shall transmit them to the Committee on Rules for proper disposition." 24th Guam Legislature Standing Rule § 4.07. But, as the Guam Supreme Court explained, it is not clear whether this rule of general applicability authorizes receipt of messages from the Governor while the Guam Legislature is in adjournment. Even if Rule § 4.07 were read to designate a specific agent for receipt of messages from the Governor during adjournments, it fails to provide the detailed procedures for safekeeping that we identified in *Bordallo*. Such an ambiguous grant of authority does not satisfy *Bordallo*'s requirements.

As the Guam Supreme Court concluded, the Guam Legislature has not identified any legitimate interest that is served by its failure to provide clearly proscribed procedures, and their absence raises the very concerns that the pocket veto provisions in Guam's Organic Act were intended to avoid:

> The Legislature could have easily chosen to amend its Standing Rules to provide for return procedures, ... yet it did not. Such procedures are important in order to effect orderly government and better serve the people of Guam. If there is uncertainty regarding the delivery of bills back to the Legislature or if bills are not properly recorded and preserved, the Legislature cannot act swiftly to override a veto, if necessary, or perhaps enact further legislation that would be dependent upon any prior en-

---

**5.** We recognize that *Bordallo*, a per curiam opinion, presents an abbreviated explanation of its holding. As the Guam Supreme Court recognized, though, *Bordallo*'s principal proposition—that the legislature may designate agents for return of a veto message, provided it adopts specified minimum procedural safeguards—follows from the principles established in the U.S. Supreme Court's seminal decisions in *The Pocket Veto Case*, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929) and *Wright v. United States*, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1938), which addressed the federal Constitution's pocket veto clause. U.S. Const. art. I, § 7, cl. 2. The principles established in those cases govern our interpretation of 48 U.S.C. § 1423i because § 1423i incorporates the language of the federal pocket veto provision. Congress can be presumed to have been aware of the Supreme Court's interpretation of the federal constitutional provision in *The Pocket Veto Case* and *Wright* when Congress enacted § 1423 in 1950. *See Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (holding that, "where ... Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute").

actment. Both the Executive and the Legislative Branches should be certain and aware, in a timely manner, of the status of legislation at all times within the enactment process. More extensive procedures surrounding delivery to the Legislature, when adjourned, are needed to ensure that.

*Pangelinan,* 2000 WL 263216, at *6; *cf. The Pocket Veto Case,* 279 U.S. at 684–85, 49 S.Ct. 463 (holding that the safeguards of the federal pocket veto clause are intended to "giv[e] public, certain and prompt knowledge as to the status of [a ] bill" and "enable Congress to proceed immediately with its reconsideration"); *see also Wright,* 302 U.S. at 590, 594–95, 58 S.Ct. 395 (same; holding that federal pocket veto clause should be interpreted so as not to place any "artificial formalit[ies]" in the way of Congress's reconsideration of bills).

Because the Guam Legislature failed to provide adequate return procedures, it "prevent[ed] ... return" of Bill 495. Thus, the Governor's inaction resulted in a pocket veto.

### 2. *Ratification*

Finally, Defendants assert that, even if there were a pocket veto of Bill 495, "the legislature recognized the validity" of the bill by referencing it in subsequent laws, thereby ratifying it.

 This argument lacks merit. It is true that when a bill fails to pass into law or a law is later invalidated or repealed, under certain circumstances, the bill or law may be given new legal force by subsequent, duly enacted laws. This can occur when the subsequent laws manifest an *intent* to enact the failed bill or reenact the invalidated or repealed law. *See, e.g.,* 1A Sutherland Statutory Construction, Amendatory Acts and Unconstitutional Statutes

§ 22.04, at 182–83 (5th ed. 1993) (question is one of the "intent of the legislature").

 Nothing in the cited statutes indicates that the Legislature intended to incorporate failed Bill 495 by reference in the subsequently enacted laws. To the contrary, the subsequently enacted statutes suggest that the Legislature erroneously assumed that Bill 495 had lapsed into law without the Governor's signature.

 Moreover, Public Law 24–272, adopted October 2, 1998, "repealed and reenacted" the solid waste management provisions of Bill 495. The reenacted provisions stand on their own as duly-enacted sections of Public Law 24–272. However, Public Law 24–272 did not, merely by reference, inject new life into Bill 495 after the bill was invalidated by the Governor's pocket veto. The subsequent law could not resurrect Bill 495 in its entirety by reenacting a part.

### III.

### *Conclusion*

We conclude that the petition presents a justiciable case or controversy that confers standing on the Governor. On the merits, we affirm the Guam Supreme Court's decision that, under the circumstances of this case, the Legislature's failure to adopt adequate procedures for the return of a bill resulted in a pocket veto of Bill 495. We further conclude that Bill 495 was not subsequently ratified.

AFFIRMED.