Pedro Parrilla Montañez, como padre con patria potestad sobre sus menores hijos Carlos, Augusto, Margarita, Guillermo y Eduardo Parrilla y Bonilla, demandante y apelado, *v.* Herbert A. Martin, Comisionado Interino de Instrucción de Puerto Rico, sustituído por Mariano Villaronga, Comisionado de Instrucción, demandado y apelante.

Núm. 9580.—*Sometido:* Diciembre 8, 1947. *Resuelto:* Enero 28, 1948.

*Hon.' Procurador General Luis Negrón Fernández, Carlos Santana Becerra y A. Torres Braschi, Procuradores Generales Auxiliares,* abogados del apelante; *R. Arjona Siaca,* abogado del apelado; *Guillermo Cintrón Ayuso,* abogado de la Unión Americana de Libertades Civiles, ésta como *amicus curiae.*

Opinión del Juez Asociado Señor De Jesús, en la cual concurre el Juez Presidente Señor Travieso.█

En su sesión ordinaria de 1946 la Legislatura de Puerto Rico aprobó, sobre el veto del Gobernador, el Proyecto del Senado núm. 51, disponiendo el uso exclusivo del idioma español para la enseñanza en las escuelas públicas. Al vedarlo por segunda vez, el Gobernador lo envió por correo el 30 de abril de 1946 al Director de la División de Territorios y Posesiones Insulares, con súplica de someterlo al Presidente para su consideración. El día 6 de mayo siguiente lo recibió el Director de la División de Territorios y Posesiones Insulares, pero por razones que no constan de los autos, no lo envió a Casa Blanca hasta el 6 de agosto en que lo recibió un empleado de la oficina del Presidente.

El 13 de agosto de 1946 el apelado radicó en la corte inferior este procedimiento sobre sentencia declaratoria. Alegó, entre otras cosas, que habían transcurrido más de noventa días desde que el Gobernador transmitió el proyecto de ley a la División de Territorios y Posesiones Insulares; y que el Presidente no lo había devuelto, por lo cual se había convertido en ley y pedía sentencia declarándolo así, y que el demandado debía ponerla en ejecución.

El demandado se opuso a las pretensiones del demandante y antes de celebrarse el juicio, radicó una alegación suplementaria a la contestación en la cual expuso que el 25 de octubre de 1946 el Presidente había desaprobado el proyecto de ley. No obstante dicha desaprobación, la corte a quo dictó sentencia el 25 de febrero de 1947, declarando que el proyecto se había convertido en ley desde el 4 de agosto de 1946 y que debía ponerse en ejecución por el demandado.

Opinó la corte que desde el instante en que el proyecto fué recibido por la División de Territorios y Posesiones Insulares, debía entenderse recibido por el Presidente y consecuentemente que desde esa fecha, 6 de mayo de 1946, empezó a correr el plazo fijado al Presidente para aprobar o desaprobar el proyecto de ley de conformidad con el artículo 34 de la Ley Orgánica, el cual, en lo pertinente, prescribe:

". . . Cuando un proyecto de ley que haya sido aprobado se presente al Gobernador para su firma, si éste lo aprobare, lo firmará; si no lo aprobare, lo devolverá con sus objeciones a la Cámara en donde se originó, la cual anotará dichas objeciones por extenso en su libro de actas, y procederá a reconsiderar el proyecto. Si después de dicha reconsideración, las dos terceras partes del número total de miembros de esa Cámara convinieren en pasar el proyecto, será el mismo enviado, junto con las objeciones, a la otra Cámara, por la cual será también reconsiderado, y si fuere aprobado por las dos terceras partes de todos los miembros de esa Cámara, será remitido al Gobernador, quien, en caso de que entonces no lo aprobare, *lo transmitirá al Presidente de los Estados Unidos*. . . Si el Presidente de los Estados Unidos aprobare el proyecto, lo firmará y pasará a ser ley. Si no lo aprobare, lo devolverá al Gobernador manifestándolo así, y no será ley; *Disponiéndose,* que el Presidente de los Estados Unidos aprobará o desaprobará una ley *a él sometida* en virtud de las disposiciones de este Artículo, dentro de noventa días de haberle sido sometida para su aprobación; y si no la aprobare dentro de ese plazo, se convertirá en ley como si la hubiese aprobado especialmente. . ." (Bastardillas nuestras.)

Es digno de notarse que el artículo 34 arriba citado, impone dos deberes distintos al Gobernador y al Presidente, respectivamente. Al primero le ordena *que trasmita* el proyecto de ley al Presidente.[1] Una vez trasmitido, queda

[1] En su carta de 30 de abril de 1946, dirigida al Director de la División de Territorios y Posesiones Insulares, el Gobernador Tugwell se expresó así:

"Estimado Sr. Arnold: Le incluyo una carta para el Presidente de los Estados Unidos con documentos recomendándole que sostenga mi veto al Proyecto núm. 51 del Senado aprobado en la última sesión de la Legislatura de Puerto Rico.—La carta y documentos que la acompañan se explican por sí mismos.—*Le agradeceré mucho los envíe por el conducto adecuado para su presentación al Presidente, a los efectos de su consideración.*" (Bastardillas nuestras.)

cumplido el deber del Gobernador. Al segundo le confiere la facultad de aprobarlo o desaprobarlo, para lo cual le concede un término de noventa días a contar desde que le haya sido sometido. Una vez sometido al Presidente, empieza a correr el término que la ley le concede para su consideración. No dice la ley que el referido plazo se cuente desde que el Gobernador trasmite el proyecto. Por el contrario, expresamente dispone que empieza a correr desde que el proyecto de ley *ha sido sometido* al Presidente para su aprobación.

La letra de la ley es clara. La corte inferior no rechaza esta interpretación, pero opina que la División de Territorios y Posesiones Insulares es un agente del Presidente y consecuentemente, el recibo del proyecto por la División, equivale a su entrega al Presidente. La corte inferior busca apoyo para esta teoría en el artículo 11 de la Ley Orgánica, ([2]) en

(2) El artículo 11 de la Ley Orgánica prescribe:

"Todos los informes que, de acuerdo con la ley, tengan que dar el Gobernador o los jefes de departamentos a cualquier funcionario de los Estados Unidos, serán dados en lo sucesivo a un departamento ejecutivo del Gobierno de los Estados Unidos, que será designado por el Presidente y éste queda autorizado por esta Ley para poner todos los asuntos que correspondan al Gobierno de Puerto Rico bajo la jurisdicción de dicho departamento."

El artículo 11 de la vigente Ley Orgánica fué tomado de la sección 2 de la Ley del Congreso de 15 de julio de 1909 (36 Stat. 11 (1909)), para enmendar la anterior Ley Orgánica conocida por Ley Foraker que rigió hasta el 1ro. de marzo de 1917. La sección 2 de la referida Ley de 15 de julio de 1909, decía así:

"Que todos los informes que, de acuerdo con la ley, tengan que dar el Gobernador o los miembros del Consejo Ejecutivo de Puerto Rico a cualquier funcionario de los Estados Unidos, serán dados en lo sucesivo a un departamento ejecutivo del Gobierno de los Estados Unidos que será designado por el Presidente; y el Presidente queda autorizado por esta Ley para poner todos los asuntos que correspondan al Gobierno de Puerto Rico bajo la jurisdicción de dicho departamento."

Haciendo uso de la autoridad que le confería la citada sección 2 de la Ley del Congreso de 15 de julio de 1909, el Presidente Taft, el mismo día que aprobó la referida ley, expidió la Orden Ejecutiva que en lo pertinente, decía así:

". . . todos los informes que de acuerdo con la ley, tengan que dar el gobernador o los miembros del Consejo Ejecutivo de Puerto Rico a cualquier funcionario de los Estados Unidos serán dados al Departamento de la Guerra y todos los asuntos que correspondan al Gobierno de Puerto Rico se pondrán bajo la jurisdicción de ese departamento. Los asuntos del departamento con-

la Ley del Congreso de 3 de marzo de 1933(³) y en la Orden Ejecutiva promulgada por el Presidente Roosevelt el 29 de mayo de 1934.(⁴)

## I

 Para determinar si es correcta la teoría de la corte a quo, precisa un examen de las referidas leyes y Orden Ejecutiva.(⁵)

cernientes al gobierno civil de Puerto Rico quedan asignados al Negociado de Asuntos Insulares de conformidad con la Sección 87 de la Ley de 1ro. de julio de 1902. William H. Taft, Casa Blanca, Julio 15, 1909.''

(³)Esta Ley, en lo pertinente prescribe:

''Siempre que el Presidente, previa investigación, encuentre y declare que cualquier reagrupación, consolidación, transferencia o abolición de cualquier agencia o agencias ejecutivas y/o las funciones de las mismas sea necesaria para llevar a cabo cualquiera de los propósitos expuestos en la sección 401 de este Título, puede, por orden ejecutiva:

''(a) Transferir en todo o en parte cualquier agencia ejecutiva y/o las funciones de la misma a la jurisdicción y control de cualquier otra agencia ejecutiva;

''(b) Consolidar las funciones confiadas a cualquier agencia ejecutiva; o

''(c) Abolir en todo o en parte cualquier agencia ejecutiva y/o las funciones de la misma; y

''(d) Designar y fijar el nombre y funciones de cualquier actividad consolidada o agencia ejecutiva y el título, facultades y deberes de su jefe ejecutivo; excepto que el Presidente no tendrá autoridad bajo este Título para abolir o transferir un departamento ejecutivo y/o todas las funciones del mismo.'' 47 Stat. 1518 (1933).

(⁴)La Orden Ejecutiva del Presidente Roosevelt de fecha 29 de mayo de 1934, en lo pertinente, prescribe:

''...Por Cuanto, luego de una investigación yo encuentro y declaro que el establecimiento de una División de Territorios y Posesiones Insulares en el Departamento de lo Interior y la transferencia al mismo de las funciones del Negociado de Asuntos Insulares, Departamento de la Guerra, que correspondan a la administración del Gobierno de Puerto Rico es necesario para cumplir los propósitos de dicha sección 16; Por Tanto, por virtud de y de conformidad con la autoridad que me ha sido conferida por la referida sección 16 de la Ley de 3 de marzo de 1933, se ordena que una División que se denominará División de Territorios y Posesiones Insulares quede por la presente establecida en el Departamento de lo Interior; y se ordena, además, que todas las funciones del Negociado de Asuntos Insulares, Departamento de la Guerra, junto con su personal, archivos . . . que correspondan a o se relacionen con la administración del Gobierno de Puerto Rico, son por la presente transferidos del Departamento de la Guerra a la División de Territorios y Posesiones Insulares, Departamento de lo Interior, para ser administrados bajo la supervisión del Secretario de lo Interior. . .''

(⁵)Es justo consignar que los abogados del demandado, tanto en su alegato

El artículo 11 de la Ley Orgánica prescribe que los informes que de acuerdo con la ley tienen que dar el gobernador o los jefes de departamentos "a cualquier funcionario de los Estados Unidos", los dará a un Departamento Ejecutivo del Gobierno de los Estados Unidos que designará el Presidente y autoriza, además, a éste, a poner los asuntos que correspondan al Gobierno de Puerto Rico bajo la jurisdicción de ese Departamento.

La Ley del Congreso de 3 de marzo de 1933 (47 Stat. 1517 (1933)) dispone que el Presidente investigue y determine la reorganización que fuere necesario llevar a cabo dentro de la rama ejecutiva del Gobierno y lo autoriza para hacerla.

Por último, la Orden Ejecutiva de 29 de mayo de 1934 creó la División de Territorios y Posesiones Insulares adscrita al Departamento de lo Interior. Dispuso que todas las funciones del Negociado de Asuntos Insulares del Departamento de la Guerra,(6) juntamente con su personal, archivos, etc., correspondientes a o relacionadas con la administración del Gobierno de Puerto Rico, quedaban, a virtud de dicha Orden, transferidos del Departamento de Guerra a la División de Territorios y Posesiones Insulares del Departamento de lo Interior para ser administradas bajo la supervisión del Secretario de lo Interior.

Nada encontramos en dichas leyes ni en la Orden Ejecutiva de lo cual racionalmente pueda inferirse que la División de Territorios y Posesiones Insulares sea un agente del Presidente. El ordenar al Gobernador y a los Jefes de Departamento que los informes que de acuerdo con la ley tuvie-

---

como en su informe oral, no aceptan que la transmisión de un proyecto de ley al Presidente constituya el informe a que se refiere el artículo 11 de la Ley Orgánica. Sin embargo, a los efectos de esta opinión, vamos a partir de la hipótesis que el artículo 11 es de aplicación. Como cuestión de hecho el Gobernador Tugwell, al transmitir el proyecto de ley, acompañó un informe al Presidente expresando los motivos por los cuales lo vedaba y recomendaba su desaprobación. Véase la Nota 1.

(6) Véase el final de la Nota 2.

ran que dar "a cualquier funcionario de los Estados Unidos" los den a la División de Territorios y Posesiones Insulares, no constituye a dicha División en un agente del Presidente de los Estados Unidos, en relación con una facultad impuesta por la ley al Presidente en persona, tan importante como la del ejercicio del veto. Como se dice en la opinión concurrente del Juez Stone, con la cual estuvo conforme el Juez Brandeis, en el caso de *Wright* v. *United States,* 302 U. S. 583 (nota 4, pág. 601) la importante facultad de recibir un proyecto de ley, a nombre del Presidente no se confiere *sub silentio.*

La trascendencia del poder del veto se expone con elegante sencillez en el caso de *Okanogan Indians* v. *United States,* 279 U. S. 655, 677-8:

"La Constitución, al conferir al Presidente una facultad negativa sobre la Legislación—comúnmente denominada veto—le confiere una autoridad y le impone un deber de la más alta trascendencia en el cumplimiento del cual debe, no sólo firmar los proyectos de ley que aprueba para que se conviertan en ley, sí que también devolver los proyectos que desapruebe, con sus objeciones, para que puedan ser reconsiderados por el Congreso. El fiel y efectivo cumplimiento de este trascendental deber indefectiblemente requiere tiempo, dentro del cual el Presidente pueda cuidadosamente examinar y considerar un proyecto de ley y determinar, previa la debida deliberación, si lo aprueba o desaprueba, y si lo desaprueba, formular sus objeciones para la consideración del Congreso. A ese efecto se le concede un plazo determinado a contar desde que el proyecto de ley le ha sido presentado, dentro del cual puede examinar sus disposiciones y aprobarlo o devolverlo sin su aprobación para ser reconsiderado. (Citas). La facultad así conferida al Presidente no puede ser restringida ni limitada por el Congreso, ni el tiempo dentro del cual debe ser ejercitada, acortarse directa o indirectamente. Y es parte tan esencial de los preceptos constitucionales dirigidos a impedir legislación irreflexiva o impropia, que el Presidente, por su parte, disponga de todo el tiempo concedídole para determinar si aprueba o desaprueba un proyecto de ley, o si lo desaprueba para que adecuadamente formule las objeciones que deben ser consideradas por el Congreso, como lo es que el Congreso por su parte, tenga una oportunidad de volver a aprobarlo, no obstante sus objeciones."

Si reflexionamos por un instante que, al exigir la sección 34 que el proyecto de ley *sea sometido* al Presidente tiene por objeto que éste y sólo éste lo apruebe o desapruebe, no podemos dar al artículo 11 y a la Orden Ejecutiva de 29 de mayo de 1934 la interpretación que le da la corte inferior, con el paradójico resultado que ya hemos visto, de considerar, como convertido en ley desde el 4 de agosto de 1946 un proyecto enviado, por primera vez a Casa Blanca, el 6 de agosto de 1946. Es decir, dos días antes de que el Presidente tuviera la oportunidad de aprobar o desaprobar el proyecto ya había quedado convertido en ley, según la corte inferior, por el mero hecho de retenerlo la División de Territorios y Posesiones Insulares sin someterlo al Presidente. En otras palabras, el importante poder de aprobar o desaprobar la ley, conferido al Presidente por el artículo 34 de la Ley Orgánica, quedó sin ser ejercido por el Presidente debido a la omisión de la División de Territorios y Posesiones Insulares. Podrá suceder una situación como la del presente caso, pero ésta es una extraordinaria que no habría ocurrido si la División de Territorios y Posesiones Insulares hubiera sometido el proyecto al Presidente con más prontitud, o si la ley fijase un término dentro del cual el proyecto de ley debiera ser sometido al Presidente para su aprobación. Y ante la alternativa en que nos ha colocado la División de Territorios y Posesiones Insulares de que se prive al Presidente de cumplir cabalmente el deber que le impone el artículo 34 de la Ley Orgánica o el de que la aprobación o desaprobación por el Presidente de una ley de la Asamblea Legislativa de Puerto Rico aprobada no obstante el veto del Gobernador, esté pendiente por un tiempo mayor del necesario por no haber sido sometida prontamente al Presidente, debemos optar por la interpretación que da efecto al artículo 34 de la Ley Orgánica.

A nuestro juicio, el propósito del citado artículo 11 de la Ley Orgánica, en lo que a la trasmisión de dichos informes concierne, es indicar el canal oficial por el cual éstos debe-

rán ser enviados. Y en el presente caso ya hemos dicho que el Gobernador cumplió su deber trasmitiendo el proyecto por la vía oficial correspondiente. Si la División de Territorios y Posesiones Insulares no cumplió con el suyo con la debida diligencia, es impertinente a los efectos del presente caso; y no por ello ha de convertirse el proyecto en ley contra la voluntad del Presidente, expresada dentro del plazo de noventa días desde que realmente le fué sometido.

## II

██ La corte a quo también descansa su teoría en el hecho de que un profesor de la Universidad de Kent y el abogado del demandante escribieron al Presidente sendas cartas en relación con el proyecto de ley, y que si bien no recibieron contestación alguna de Casa Blanca, la tuvieron del Departamento de lo Interior indicándoles que dichas cartas le habían sido referidas. Esta circunstancia es interpretada por la corte a quo y por el apelado como una indicación de que el Presidente consideraba sometido el proyecto a su consideración y daba traslado del mismo al Departamento de lo Interior para su estudio e informe. De esta inferencia concluyen que el tiempo que el proyecto estuvo detenido en el Departamento de lo Interior debe computarse como si hubiera estado bajo la consideración del Presidente. Citan el caso de *State* v. *Grant Superior Court,* 172 N. E. 897 (1930).

Si las cartas acusando recibo hubieran procedido de otro Departamento que no fuera el de lo Interior, podría existir algún fundamento para la inferencia de que al serle referidas por Casa Blanca indicaba que el Presidente le había enviado el proyecto para su estudio e informe. Debemos presumir que la oficina del Presidente no ignoraba que de haber sido trasmitido el proyecto de ley por el Gobernador y no haberse sometido todavía al Presidente, debía hallarse en la División de Territorios y Posesiones Insulares, por cuyo conducto debía sometérsele, de conformidad con lo dispuesto en la Orden Ejecutiva de 29 de mayo de 1934. Parece lógico

que en tales circunstancias, dicha correspondencia fuese remitida a la División de Territorios y Posesiones Insulares para ser considerada por el Presidente conjuntamente con el proyecto cuando le fuere sometido para su consideración. Las cartas estaban relacionadas con el proyecto de ley y nada más natural que se conservasen unidas al mismo.

El caso de *State* v. *Grant Superior Court*, supra, carece de pertinencia. En dicho caso el Gobernador había designado a uno de los empleados de su oficina para que recibiese los proyectos que le presentara la Legislatura para su consideración. El Gobernador le dió instrucciones al efecto de que todo proyecto que llegase a su oficina después de la medianoche del 8 de marzo, lo enviara inmediatamente al Procurador General para su estudio e informe. Al llegar el mensajero de la Legislatura con el proyecto en discusión, el empleado de la oficina del Gobernador, en cumplimiento de lo que se le había ordenado, le dijo al mensajero de la Legislatura que lo entegara al Procurador General, y así lo hizo. Surgió entonces la cuestión de si el tiempo que el Procurador General retuvo el proyecto debía computarse como parte del tiempo concedido al Gobernador para considerarlo. A la luz de estos hechos, la Corte Suprema de Indiana resolvió que mientras el proyecto estuvo en poder del Procurador General, por orden del propio Gobernador, debía entenderse que se hallaba bajo la consideración del Jefe del Ejecutivo.

Parece claro que si en el caso de autos el proyecto hubiera sido sometido al Presidente y éste lo hubiese remitido al Departamento de lo Interior para estudio e informe, sería de aplicación el caso de *State* v. *Grant Superior Court,* supra, y siendo correcta su doctrina la hubiéramos seguido en el presente caso. Pero los hechos no lo justifican.

Otros casos citados por la corte inferior y por el apelado no son aplicables ni justifican que nos detengamos a diferenciarlos.

*Procede revocar la sentencia apelada y dictar otra decla-*
*rando que el Proyecto del Senado núm. 51 nunca llegó a con-*
*vertirse en ley por haber sido desaprobado por el Presidente*
*de los Estados Unidos dentro del plazo de noventa días desde*
*que fué sometido a su consideración.*

El Juez Asociado Sr. Marrero se inhibió.

Opinión del Juez Asociado Señor Snyder.

■ Si bien convengo sustancialmente con una parte con-
siderable de la opinión del Juez Asociado Sr. De Jesús, creo
que la sentencia de este Tribunal debe fundamentarse primor-
dialmente en la conclusión explícita de que el artículo 11 de
la Carta Orgánica no tiene nada que ver con este caso y que
es únicamente el artículo 34 el que lo controla.

En primer lugar, de su propia faz el artículo 11 no es
aplicable. Se refiere solamente a informes sometidos por
el Gobernador a un departamento ejecutivo de los Estados
Unidos a ser designado por el Presidente. Nada hay en di-
cho artículo que se refiera a la trasmisión de proyectos por

el Gobernador al Presidente. A dicha cuestión la cubre exclusivamente el artículo 34 de la Carta Orgánica.

En segundo lugar, la historia legislativa de los artículos 11 y 34 refuerza esta interpretación. El artículo 11, que ordena el envío de los informes del Gobernador, no aparece en su texto actual en la Ley Foraker de 1900. 31 Stat. 77. Se aprobó originalmente en 1909 como una enmienda a la Ley Foraker, 36 Stat. 11;. y se volvió a aprobar sin que sufriera cambio fundamental alguno en el Acta Jones de 1917. 39 Stat. 951. Por otro lado, la disposición en cuanto al veto presidencial que se encuentra en el artículo 34 apareció por primera vez en el Acta Jones. El punto es obvio. Si mediante el artículo 34 el poder del veto se le confirió al Presidente por primera vez mediante el Acta Jones, el Congreso no puede haber tenido en mente fijar el procedimiento para la trasmisión de proyectos por el Gobernador al Presidente en el artículo 11, que fué aprobado ocho años antes de que se aprobara el artículo 34. El artículo 11 no arroja luz alguna a nuestro problema; la decisión de este caso depende del alcance del artículo 34.

 Una vez que llegamos a la conclusión de que aquí controla el artículo 34, el caso se torna sencillo. Contrario al artículo 11, nada hay en el 34 con respecto a la trasmisión de proyectos por el Gobernador a un departamento ejecutivo de los Estados Unidos que actúa como agente del Presidente para recibirlos. Al contrario, el artículo 34 provee que el Gobernador trasmitirá los proyectos al Presidente. Suponiendo que éste pueda, no obstante, delegar autoridad a un agente para recibir los proyectos a su nombre, el Presidente no ha hecho esto. En su consecuencia, el Departamento del Interior actuó como agente del Gobernador para trasmitirle el proyecto al Presidente, y no como agente de éste para recibirlo. El período de noventa días dentro del cual el Presidente debe aprobar o desaprobar un proyecto, por tanto, no empezó a correr cuando el Departamento recibió el proyecto del Gobernador, con súplica de éste de que

lo sometiera al Presidente. Más bien empezó a correr desde la fecha en que el Presidente recibió el proyecto del Departamento, que actuó como ˙agente del Gobernador para trasmitirlo al Presidente. Toda vez que éste vedó el proyecto dentro del período de noventa días calculado en esta forma, el proyecto no se convirtió en ley.

Lo que complica este caso es el hecho de que el Departamento del Interior, como agente del Gobernador, no transmitió el proyecto al Presidente hasta tres meses después de haberlo recibido del Gobernador. Su Asesor Legal dijo en una opinión que "Este Departamento fué *less than prompt* al trasmitirle el proyecto al Presidente." A la luz de los hechos, esa manifestación merece ser˙incluída en el *Department of Understatement* de "The New Yorker".

El Presidente tiene noventa días para aprobar o desaprobar un proyecto. Bajo la ley en vigor y según la práctica, una de las funciones del Departamento del Interior es estudiar los proyectos y aconsejar al Presidente sobre los mismos. Pero el espíritu del artículo 34 tiene por miras que el estudio será hecho por el Departamento mientras el período de noventa días esté corriendo.

El Departamento, como agente del Gobernador, debió haber trasmitido inmediatamente el proyecto al Presidente. Después de recibirlo, el Presidente indudablemente lo hubiera referido al Departamento para que éste, actuando como, agente suyo le rindiera una opinión. Y mientras se hacía el estudio, hubiera estado corriendo el período de noventa días. Por el contrario, el Departamento, como agente del Gobernador, optó por retener el proyecto y no enviarlo al Presidente durante tres meses. En verdad que fué *less than prompt* en tardarse tres meses en realizar el mero acto de trasmitirle el proyecto al Presidente. Durante dicho período el Departamento desempeñó prematuramente el papel, enteramente diferente, de agente del Presidente para estudiar y aconsejar sobre el proyecto. Al realizar conjuntamente (*telescoping*) sus réspectivos deberes para con el Goberna-

dor y el Presidente, el Departamento frustró la intención del Congreso de que el período de noventa días dentro del cual debe actuar el Presidente corra mientras el Departamento elegido por él como su agente estudia el proyecto y le somete sus puntos de vista.

El Departamento del Interior pudo infringir el espíritu del artículo 34 porque dicho artículo, desgraciadamente, no le exige al Gobernador que le someta el proyecto al Presidente dentro de determinado período. De existir tal disposición, dicho Departamento no podría, como agente del Gobernador, dilatar a su antojo, la trasmisión del proyecto al Presidente. Quizá el Congreso desee en el futuro eliminar esta laguna en el estatuto.

Opinión disidente del Juez Asociado Señor Todd, Jr.

Disiento. Opino que el artículo 11 de la Carta Orgánica es aplicable. Aún asumiendo que técnicamente no lo fuera, la práctica administrativa establecida y aprobada por el Presidente, como cuestión de hecho probado, ha sido que todas las comunicaciones oficiales de los funcionarios del Gobierno de Puerto Rico, incluyendo al Gobernador, a cualquier funcionario de los Estados Unidos, incluyendo al Presidente, se han trasmitido al Departamento Ejecutivo del Gobierno de los Estados Unidos designado por el Presidente, antes del año 1934, al Departamento de la Guerra (Negociado de Asuntos Insulares), y después de dicho año, al Departamento de lo Interior (División de Territorios y Posesiones Insulares), de acuerdo con las Ordenes Ejecutivas de 15 de julio de 1909 y 29 de mayo de 1934. Y como cuestión de hecho probado, también, está el de que los proyectos de ley vedados por el Gobernador en ocasiones anteriores, han sido trasmitidos, con el informe correspondiente, a dicho Departamento Ejecutivo.

Al designarse por el Presidente a la División de Territorios y Posesiones Insulares del Departamento de lo Interior para recibir todos los informes que, de acuerdo con la ley, tenga que dar el Gobernador de Puerto Rico al pro-

pio Presidente, delegó e hizo su agente a dicho Departa-
mento. Que así lo entendía la Casa Blanca, lo demostró las
contestaciones a las cartas dirigidas al Presidente, por el
abogado de la apelada y por el profesor de la Universidad
de Kent, dadas por el Departamento de lo Interior, en las
que informaba que dichas cartas le habían sido referidas. Si,
como se dice en la opinión del Juez Sr. De Jesús, "Debemos
presumir que la oficina del Presidente no ignoraba que de
haber sido trasmitido el proyecto de ley por el Gobernador
y no haberse sometido todavía al Presidente, *debía hallarse
en la División de Territorios y Posesiones Insulares, por
cuyo conducto debía sometérsele, de conformidad con lo dis-
puesto en la Orden Ejecutiva de 29 de mayo de 1934"*, al no
ignorar eso la oficina del Presidente y al remitir las cartas
a dicha División, es porque consideraba que dicha Orden
Ejecutiva era aplicable, en relación con el artículo 34 de la
Carta Orgánica, al informe rendido por el Gobernador re-
lacionado con el proyecto de ley vedado. Es más, los *exhibits*
8 y 12 del demandante apelado, dos cartas del Sr. Chapman,
Secretario Interino del Departamento de lo Interior, diri-
gidas al senador Arjona Siaca, fechadas el 28 de octubre de
1946 y el 25 de noviembre de 1946, demuestran sin dejar lu-
gar a dudas, que dicha práctica administrativa existía y te-
nía la completa aprobación oficial de dicho Departamento.[1]

Tenemos que ser realistas al considerar el alcance del ar-
tículo 34 de la Carta Orgánica en cuanto al punto aquí en
controversia. Como cuestión de hecho y debido a la prác-
tica administrativa establecida, no debe sostenerse que al

---

[1]De la primera de dichas cartas extractamos: "Como su carta correc-
tamente dice, la práctica ha sido que comunicaciones dirigidas por el Goberna-
dor de Puerto Rico a los jefes de departamentos ejecutivos del Gobierno o al
Presidente son enviadas a este Departamento para su trasmisión. Un procedi-
miento similar se sigue en los otros territorios y posesiones. *También ha sido
la práctica*, debido a las responsabilidades de este Departamento en relación con
la administración del Gobierno de Puerto Rico y *de acuerdo con lo que usted
caracteriza*, en otra conexión, como '*la aprobación deliberada pero implícita
del Presidente*', que este Departamento acompañe la trasmisión al Presidente de
*legislación aprobada de nuevo por las legislaturas territoriales por sobre el*

trasmitir el Gobernador al Presidente un proyecto de ley vedado por el primero, no está trasmitiendo uno de los informes contemplados por el artículo 11 de la misma ley. Se acepta que al proyecto vedado se acompañó un informe del Gobernador exponiendo los motivos de su actuación. Sería ilógico sostener que dicho informe debió enviarse al Departamento de lo Interior y el proyecto de ley directamente al Presidente. Ambos documentos se enviaron al departamento ejecutivo designado por el Presidente para recibir cualquier informe de los funcionarios locales y, por práctica administrativa, se hizo extensiva dicha delegación para recibir los proyectos de ley vedados junto con el informe que pudiera acompañarlos. Fué el Presidente, autorizado por ley, quien designó al Departamento de lo Interior como su agente, y al recibir este último el proyecto de ley equivalía a haberlo recibido el Presidente.

En el caso de *Wright* v. *United States,* 302 U.S. 583, 590, al resolverse que el Secretario del Senado de los Estados Unidos podía recibir un proyecto de ley vedado por el Presidente, estando en receso el Senado, se dijo:

"No hay mayor dificultad en devolver un proyecto a una de las Cámaras cuando está en receso durante la sesión del Congreso que en *presentar* un proyecto al Presidente enviándolo a la Casa Blanca durante su ausencia temporal. Tal presentación es una práctica familiar. El proyecto es enviado con un mensajero y es recibido por el Presidente. Es devuelto con un mensajero, y ¿por qué no puede ser recibido por el *agente acreditado* del cuerpo legislativo? Decir que el Presidente no puede devolver un proyecto cuando la Cámara donde se originó está en receso durante la sesión del Congreso y así conceder una oportunidad para que el proyecto sea apro-

---

*veto del Gobernador* con una recomendación en cuanto a la acción a ser tomada por el Presidente bajo las disposiciones de la Carta Orgánica." (Bastardillas nuestras.)

Y de la segunda, lo siguiente: "La práctica de trasmitir al Presidente legislación aprobada de nuevo por una legislatura territorial por sobre el veto de un Gobernador con una recomendación departamental de aprobación o desaprobación, no ha sido reducida a una regla formal o regulación del Departamento. *Es enteramente una cuestión de costumbre.* El procedimiento detallado en mi carta anterior *ha sido seguido en el pasado.*" (Bastardillas nuestras.)

bado por encima de las objeciones del Presidente, es ignorar las más claras consideraciones prácticas e implicando un requisito de una formalidad artificial erigir una barrera al ejercicio de un derecho constitucional.'' (Bastardillas nuestras.)

Y esto se resolvió aun cuando no existía ley o reglamento alguno que autorizara al Secretario del Senado a recibir el proyecto durante el receso de dicho cuerpo legislativo.

Considero que el caso de *State* v. *Grant Superior Court*, 172 N. E. 897 (1930) es aplicable a los hechos del presente. En aquél, el Gobernador delegó en el Procurador General para recibir y hacer sus recomendaciones sobre el proyecto y se resolvió que el tiempo que el Procurador General lo retuvo debía computarse como parte del tiempo concedido al Gobernador para considerarlo. En el de autos, el Presidente, bien por ley y por orden ejecutiva o por práctica administrativa aprobada por él aplicando dicha ley y orden ejecutiva, delegó en la División de Territorios y Posesiones Insulares para recibir, a su nombre, el proyecto de ley, y a mi juicio el tiempo que dicha División retuvo el proyecto debe computarse en la misma forma.

Tenemos, además, que el artículo 34 de la Carta Orgánica el único deber que impone al Gobernador es el de trasmitir el proyecto de ley vedado al Presidente; que de acuerdo con el artículo 11 de la misma ley y la Orden Ejecutiva de 1934, también se impone al Gobernador el deber de enviar cualquier informe que tenga para el Presidente a través de la División de Territorios y Posesiones Insulares del Departamento de lo Interior y que dicha Orden Ejecutiva coloca bajo dicha División todos los asuntos concernientes al Gobierno de Puerto Rico. El artículo 34 de la Carta Orgánica al disponer que el Presidente aprobará o desaprobará una ley a él sometida, expresamente dice ''en virtud de las disposiciones de este artículo'', es decir, cuando le haya sido trasmitido por el Gobernador, y si dicha trasmisión, por ley y por Orden Ejecutiva o por práctica administrativa tenía que hacerse a través de la División de Territorios y Po-

sesiones Insulares, el proyecto de ley quedó sometido al Presidente a la fecha efectiva de su recibo en dicha División, o sea el 6 de mayo de 1946. Si dicho negociado federal porque estaba estudiando el proyecto o por negligencia, olvido o cualquier otro motivo, no lo sometió al Presidente con tiempo suficiente para que éste pudiera resolver si lo aprobaba o lo desaprobaba antes de vencer los 90 días fijados por la Carta Orgánica, ese hecho no debe ser motivo para que interpretemos la ley y resolvamos la cuestión legal planteada en tal forma que convierta a la División de Territorios y Posesiones Insulares en árbitro absoluto para determinar en qué fecha debe considerarse que ha quedado sometido al Presidente un proyecto de ley vedado por el Gobernador. Dicha interpretación nos llevaría al absurdo de resolver que la División de Territorios y Posesiones Insulares no tiene término fijo alguno para someter un asunto tan importante como éste a la consideración del Presidente, no obstante que, primero, la propia Carta Orgánica limita el término del Presidente a 90 días y, segundo, que dicha División está fuera del control del Gobierno de Puerto Rico y por el contrario actúa por delegación expresa del Presidente y, como cuestión de hecho, la práctica administrativa establecida tenía la aprobación deliberada aunque implícita del Presidente.

Que la práctica administrativa en casos de esta naturaleza es merecedora de seria consideración, ha sido expresamente resuelto por el Tribunal Supremo de los Estados Unidos en el "Pocket Veto Case" de *Okanogan Indians* v. *United States*, 279 U. S. 655 al expresarse en esta forma:

"Los puntos de vista que hemos expresado en cuanto a la interpretación y efecto de la disposición constitucional aquí envuelta son confirmados por la interpretación práctica que le ha sido dada por los Presidentes durante un largo curso de años y en la cual el Congreso ha asentido. *Práctica establecida y durante largo tiempo asentida es una consideración de gran peso para la debida interpretación de disposiciones constitucionales de esta naturaleza.* Compá-

rese *Missouri Pac. Ry. Co.* v. *Kansas,* 248 U. S. 276, 284, 63 L. ed. 241, 2 A.L.R. 1589, 39 Sup. Ct. Rep. 93; *Myers* v. *United States,* 272 U. S. 52, 119, 136, 71 L. ed. 160, 167, 174, 47 Sup. Ct. Rep. 21; y *State ex rel. Corbett* v. *South Norwalk,* 77 Conn. 257, 264, 58 Atl. 759, en el cual la corte dijo que una práctica de por lo menos veinte años de duración por parte del Departamento Ejecutivo, asentida por el departamento legislativo, aunque no obligaba en forma absoluta al departamento judicial, merece seria consideración al determinar la verdadera interpretación de una disposición constitucional cuya fraseología es en cualquier respecto de dudoso significado.'' (Bastardillas nuestras.)

En el caso de autos se probó que la única práctica establecida fué la de que los Gobernadores de Puerto Rico siempre enviaron todos los proyectos de ley vedados a la consideración del Presidente a través de la División de Territorios y Posesiones Insulares y que dicha práctica fué asentida por el Presidente. ¿Cómo negar, pues, fuerza legal a dicha práctica administrativa en el presente caso?

Pero es que, como dije al comenzar esta opinión, considero que el artículo 11 de la Carta Orgánica es aplicable. Ya he expuesto algunos fundamentos, pero además, no se trata en dicha disposición legal únicamente de la forma de enviar informes por los funcionarios insulares a los federales, sino que autoriza además al Presidente ''para poner todos los asuntos que correspondan al Gobierno de Puerto Rico bajo la jurisdicción de dicho departamento.'' Tanto el asunto de procedimiento a que se refiere la primera parte del artículo 11 en relación con los informes, como todos los asuntos que correspondan al Gobierno de Puerto Rico, han sido colocados por orden ejecutiva del Presidente bajo la jurisdicción del Departamento de lo Interior en su División de Territorios y Posesiones Insulares. Constituída dicha División por lo menos en su ''agente acreditado'', como se dijo en el caso de *Wright,* supra, no debemos resolver que el tiempo que utilizó el agente para considerar el proyecto de ley no deba computársele a su principal.

De no aceptarse que el Departamento de lo Interior por su División de Territorios y Posesiones Insulares, estaba autorizado a virtud del artículo 11 de la Carta Orgánica y de la Orden Ejecutiva de 1934, a recibir, a nombre del Presidente, el proyecto de ley enviado por el Gobernador de Puerto Rico, tendríamos forzosamente que concluir que su actuación al retener, durante más de noventa días, el Proyecto núm. 51 del Senado de Puerto Rico, fué ilegal y que actuó en forma altamente censurable al no trasmitir al Presidente dicho proyecto tan pronto lo recibió. No debemos interpretar la Carta Orgánica y la Orden Ejecutiva en tal forma que nos obligue a llegar a dicha conclusión.

En cuanto a la historia legislativa de los artículos 11 y 34 de la Carta Orgánica a que hace referencia el Juez Asociado Sr. Snyder en su opinión, creo que, aun cuando las dos premisas en que basa su conclusión son correctas, la conclusión no lo es. Es cierto que el artículo 11 es prácticamente una copia de la enmienda a la ley Foraker hecha en 1909 y que el artículo 34 confirió por primera vez al Presidente el poder del veto. Empero, esos dos hechos no significan que después de aprobado el artículo 34 y precisamente por la razón fundamental de que dicho artículo no fija el procedimiento para la trasmisión de proyectos de ley por el Gobernador al Presidente, no deba aplicarse el artículo 11, complementado por la Orden Ejecutiva de 1934, que sí fija dicho procedimiento o que, asumiendo que no lo hiciera, ha sido seguido como práctica administrativa, no sólo en relación con informes de carácter administrativos, sino que también y sin excepción, para la trasmisión de toda clase de comunicaciones entre el Gobernador y el Presidente incluyendo, desde luego, la trasmisión de proyectos de ley vedados por el Gobernador.

Creo que el artículo 11 y la interpretación que por práctica administrativa se le ha dado tanto por el Gobernador como por el Departamento de lo Interior y por el Presi-

dente, es el que arroja luz al problema que confrontamos en este caso ante el silencio del artículo 34 en cuanto a proveer el procedimiento oficial y adecuado para la trasmisión de proyectos de ley por el Gobernador al Presidente.

*En mi opinión, debe confirmarse la sentencia apelada.*