Edward M. **KENNEDY**, Plaintiff,

v.

Arthur F. **SAMPSON** et al.,
Defendants.

Civ. A. No. 1583–72.

United States District Court,
District of Columbia.

Aug. 15, 1973.

Edward M. Kennedy, pro se.

Harold H. Titus, Jr., U. S. Atty., Arnold T. Aikens, Asst. U. S. Atty., and Stuart E. Schiffer, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

### WADDY, District Judge.

This case is before the Court on defendants' motion to dismiss or in the alternative for summary judgment, and plaintiff's cross-motion for summary judgment. The case presents a question concerning the veto powers of the President of the United States under Article 1, Section 7 of the Constitution of the United States, specifically that portion involving what is known as the Pocket Veto.

In this action plaintiff seeks a declaratory judgment declaring that the Family Practice of Medicine Act, S. 3418, 91st Cong., 2d Sess., (hereinafter S. 3418), became a validly enacted law of the United States on December 25, 1970, without the signature of the President, in accord with Article I, Section 7, Clause 2 of the Constitution. He also seeks the issuance of an order in the nature of mandamus or a permanent injunction requiring the defendants, the Acting Administrator of the General Services Administration, and Chief of White House Records, respectively, to publish S. 3418 as a validly enacted law of the United States, "in accord with their ministerial, non-discretionary duties under 1 U.S.C. 106a, 1 U.S.C. 112 and 1 U.S.C. 113."

The following material facts are not disputed:

1. Plaintiff is a taxpaying citizen of the United States, the Senior Senator from the Commonwealth of Massachusetts and the Chairman of the Subcommittee on Health of the Committee on Labor and Public Welfare of the United States Senate.

2. On December 14, 1970, S. 3418 was presented to the President of the United States for his consideration. The legislation had been approved by the Senate, in which it had originated, by a vote of 64–1 and by the House of Representatives by a vote of 346–2. The Bill authorized the Congress to appropriate 225 million dollars for the fiscal years, 1971, 1972 and 1973 for grants to public and private non-profit hospital and medical schools to assist them in establishing special departments and programs in the field of family practice of medicine, and otherwise to encourage and promote the training of medical and paramedical personnel in the field of family medicine.

3. Plaintiff was among the Senators voting in favor of the Bill.

4. On December 22, 1970 the Senate and the House of Representatives adjourned for the Christmas Holidays. The Senate was in adjournment until December 28, 1970, and the House until December 29, 1970. The adjournments were consented to by the Senate and the House of Representatives.[1] During the recess of the Senate, the Secretary of the Senate was authorized by unanimous vote of the Senate to receive messages from the President of the United States and the House of Representatives and the President pro tempore or Acting President pro tempore was authorized to sign duly enrolled bills.[2]

5. On Thursday, December 24, 1970, while both Houses of Congress were in the aforementioned adjournment the President of the United States issued a Memorandum of Disapproval, announcing that he was withholding his approval from S. 3418.

6. Under the provisions of 1 U.S.C. § 106a, 1 U.S.C. § 112 and 1 U.S.C. § 113, it is the duty of the Administrator of the General Services Administration of the United States to receive bills that have become laws of the United States and to publish them in slip form and in the United States Statutes at Large.

7. The Chief of White House Records is an employee of the United

---

1. S.Con.Res. 87, 91st Cong., 2d Sess. (1970).

2. 116 Cong.Rec. 43221, (Dec. 22, 1970).

States whose duty is to receive enrolled bills from the Congress and to deliver bills that have become laws of the United States to the Administrator of General Services Administration of the United States for publication.

8. S. 3418 was not transmitted by the President or the Chief of White House Records to the Administrator of General Services Administration and it has not been published in slip form or in the Statutes at Large as a law of the United States.

9. On December 15, 1971, by Pub.L. No. 92–184, Congress appropriated $100,000 to carry out the program set forth in S. 3418 for the fiscal year 1972.[3]

10. Plaintiff is not within the class intended to be benefited by the Bill.

With regards to the merits of the case, the question before this Court is whether the President's exercise of the Pocket Veto in this case was constitutionally valid, or, in other words, did S. 3418 become law without the signature of the President. Before reaching the merits, however, the Court must consider several preliminary issues raised by the defendants in their motion to dismiss and/or for summary judgment. They contend that the plaintiff lacks standing to maintain this action; that the President is an indispensable party

who cannot be sued; that the issue before the Court does not present a substantial case or controversy because it is (1) a non-justiciable political question, and (2) the complaint seeks an advisory opinion.

The Court holds that each of defendants' contentions is without merit.

## STANDING

In Flast v. Cohen, 392 U.S. 83, 88 S. Ct. 1942, 20 L.Ed.2d 947 (1968) the Supreme Court of the United States stated:

"The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions. Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a par-

---

3. On July 1, 1973, President Nixon signed into law the "Second Supplemental Appropriations Act, 1973," H.R. 9055, 93rd Cong., 1st Sess., Chapter VII of that bill provides in part:
   *"Health Manpower"*
   "For an additional amount of 'Health Manpower' to remain available until expended to carry out the Family Practice of Medicine Act of 1970 (S. 3418, Ninety-first Congress), $100,000."
   In reporting on the proposed legislation the Senate Committee on Appropriations stated:
   "The Committee recommends $100,000 to fund the provisions of the Family Practice of Medicine Act.
   "There is no dispute that the most serious shortages within the private practice of medicine is that of general or family practitioners. Without exception, public witnesses who have appeared before the

Commiteee over the years have emphasized these needs and many requested early implementation of the Family Practice of Medicine Act, overwhelmingly passed by the Congress during the 91st session. Last year the Congress included the modest sum of $100,000 in the 1972 Supplemental Appropriations Act to be allocated under the provisions of the Family Practice of Medicine Act. Unfortunately these funds were not allocated. The Committee is again recommending a modest sum to implement the provisions of this Act. The Committee views this amount as a first installment and would be receptive to a budget request for greatly increased funding for the item. Because of the impending expiration of the authorization legislation, the Committee has included language which allows the funds to remain available until expended." S.Rep. No. 160, 93rd Cong., 1st Sess., pp. 48–49.

ticular issue and not whether the issue itself is justiciable." 392 U.S. at 99, 88 S.Ct. at 1952.

In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court formulated a dual test for determining standing to sue. This test requires, first, that plaintiff allege that the challenged acts have caused him "injury in fact, economic or otherwise," 397 U.S. at 152, 90 S.Ct. at 829 and second, that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. Or, as the Supreme Court stated in *Flast, supra,* a "logical nexus between the status asserted and the claim sought to be adjudicated." 392 U.S. at 102, 88 S.Ct. at 1953. This test for the determination of standing was re-affirmed by the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

█ When the above-mentioned test is applied to this action it becomes clear that this plaintiff has the requisite standing to sue. The precise injury of which he claims is that the President's exercise of the Pocket Veto to disapprove S. 3418 was an unconstitutional act that rendered plaintiff's vote in the Senate for the bill ineffective and deprived him of his constitutional right to vote to override the Presidential Veto in an effort to have the bill passed without the President's signature. This claim of nullification of his vote for the bill and deprivation of his right to vote to override the veto and thus inhibiting him in the performance of his Senatorial duties, is a clear allegation of injury in fact.

The maintenance of the effectiveness of his vote in the Senate which plaintiff seeks to protect is certainly arguably within the zone of interests to be protected by Article I, Section 7 of the Constitution and supplies the logical nexus between his status as a Senator and the claim sought to be adjudicated.

A finding of standing under the circumstances here presented is consistent with the above-mentioned cases and with the finding of the Supreme Court in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) and of the United States Court of Appeals for the District of Columbia Circuit in Mitchell v. Laird, No. 71–150 (March 20, 1973).

In *Coleman* a proposed Child Labor Amendment to the Constitution of the United States was submitted to the Kansas State Legislature. In 1925, that Legislature adopted a resolution rejecting the amendment. Subsequently, in 1937, a resolution favoring ratification was introduced in the Senate of Kansas. When the resolution was considered by the State Senate 20 State Senators voted for ratification and 20 voted against. The Lieutenant Governor, the presiding officer, cast the deciding vote in favor of ratification. Thereafter, the resolution was approved by a majority of the Kansas House of Representatives. Twenty-one State Senators, including the twenty Senators who had opposed the resolution for ratification, and three members of the State House of Representatives, then brought a suit in the State Supreme Court contesting the validity of the resolution and alleging that the Lieutenant Governor had no power to cast his vote. Relief was denied and the Supreme Court of the United States granted certiorari.

One of the principal contentions of the respondents before the United States Supreme Court was that the petitioners lacked interest to invoke the jurisdiction of the Court to review. Chief Justice Hughes, writing for the Court, squarely rejected that contention and stated:

"We find the cases cited in support of the contention, that petitioners lack an adequate interest to invoke our jurisdiction to review, to be inapplicable. Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient

to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes. Petitioners come directly within the provisions of the statute governing our appellate jurisdiction. They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege." 307 U.S. at 438, 59 S.Ct. at 975 (Footnote omitted) (Emphasis added).

In Mitchell v. Laird, supra, thirteen members of Congress filed an action in this Court seeking to enjoin the prosecution of the war in Indo-China and a declaratory judgment that the carrying on of the war by the defendants was in violation of Article I, Section 8, Clause 11 of the United States Constitution. On appeal the United States Court of Appeals for the District of Columbia, citing Flast v. Cohen, supra, Data Processing v. Camp, supra, and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L. Ed.2d 192 (1970), found that the Congressmen had standing to sue on a ground that had not been alleged by them. The Court stated at page 4 of the slip opinion:

"If we, for the moment, assume that defendants' actions in continuing the hostilities in Indo-China were or are beyond the authority conferred upon them by the Constitution, a declaration to that effect would bear upon the duties of plaintiffs to consider whether to impeach defendants, and upon plaintiffs' quite distinct and different duties to make appropriations to support the hostilities, or to take other legislative actions related to such hostilities, such as raising an army or enacting other civil or criminal legislation. In our view, these considerations are sufficient to give plaintiffs a standing to make their complaint."

This Court is satisfied that these authorities support the determination that plaintiff has standing to sue in this case and so finds.

## INDISPENSABLE PARTY

Defendants contend that the President of the United States is an indispensable party to this suit and that under the constitutional scheme of separation of powers this Court lacks jurisdiction over the President. They quote the following provision of 1 U.S.C. § 106a:

"Whenever a bill, order, resolution, or vote of the Senate and House of Representatives, having been approved by the President, or not having been returned by him with his objections, becomes a law or takes effect, it shall forthwith be received by the Administrator of General Services *from the President*, . . . . ." (Emphasis theirs)

and argue therefrom that when a bill becomes law, it can be promulgated and published only through joint action of the President and the Administrator of General Services. This Court disagrees.

The language of 1 U.S.C. § 106a relied upon by defendants is no more than a direction to the Administrator of General Services to get the bill from its custodian. This is made clear by the following language within the same paragraph of 1 U.S.C. § 106a which appears immediately after that quoted by defendants:

"and whenever a bill, order, resolution or vote is returned by the President with his objections, and, on being reconsidered, is agreed to be passed, and is approved by two-thirds of both Houses of Congress, and thereby becomes a law or takes effect, it shall be received by the Administrator of General Services from the President of the Senate, or Speaker of the House of Representatives in whichsoever House it shall last have been so approved, and he shall carefully preserve the originals."

The complaint in this case and the relief requested by plaintiff do not require any jurisdiction by the court

over the President of the United States. The order requested by plaintiff requires no action by the President.

Article I, Section 7, Clause 2 of the Constitution specifies the actions the President may take with respect to legislation presented to him by Congress. Thus, the President may approve the legislation by signing it into law or by allowing it to become law without his signature at the end of the ten-day period set aside by the Constitution for his action. Or, he may veto the legislation and return it to Congress with his objections. Or, he may "pocket veto" the legislation by withholding his signature when the ten-day period expires while Congress is in an adjournment that "prevents" him from returning the bill.

Whichever course he follows, the action of the President is complete upon the expiration of the ten-day Constitutional period. The time for deliberation has then passed. He has decided. His judgment has been made, and the status of the legislation has been determined. All that remains is for other Federal officers—in this action the defendants—to carry out their ministerial, non-discretionary duty of publishing Acts that have become laws of the United States in slip form and in the Statutes at Large.

This principle has been settled law since the ruling of Chief Justice Marshall in Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803). He stated at page 170:

"It is not the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus, is to be determined. Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation.

But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and therefore is never presumed to have forbidden; as for example, to record a commission or a patent for land, which has received all the legal solemnities, or to give a copy of such record; in such cases, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment . . . ."

Marbury v. Madison is one of the leading precedents for the principle that mandamus is an appropriate remedy to require subordinate federal officers to carry out their ministerial duties. That case involved the refusal by President Thomas Jefferson to acquiesce in the "midnight" judges appointed by President John Adams shortly before President Adams left office. While holding that the Act of Congress authorizing actions for mandamus to be brought in the original jurisdiction of the Supreme Court was unconstitutional, Chief Justice Marshall also held (1) that the action of President Adams was complete when the President signed Marbury's commission as a justice of the peace in the District of Columbia, (2) that all that remained was the ministerial, non-discretionary duty of President Jefferson's new Secretary of State, James Madison, to affix the seal of the United States to the commission and to deliver the commission to Marbury; and (3) that mandamus was an appropriate remedy to direct the Secretary to carry out his duty.

Similarly, in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S. Ct. 863, 96 L.Ed. 1153 (1952), the steel mill seizure case arising out of a threatened nation-wide strike of steel workers during the Korean War, the Supreme Court found no difficulty in granting

relief against the Secretary of Commerce, who had seized the nation's steel mills pursuant to an Executive Order of President Truman, claiming the inherent power to take such action as President and Commander in Chief in a time of national emergency. The Court held that the President had no power under the Constitution to take such action, and affirmed a lower court decision granting injunctive relief against the Secretary.

Finally, it is noted that two prior cases involving the exercise of the veto clauses by a President of the United States have been decided by the Supreme Court. Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929); Wright v. United States, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1938). The President was not a party to either of those cases and the Supreme Court exercised its jurisdiction and decided the cases on the merits without considering the absence of the President as a party.

## SUBSTANTIAL CASE OR CONTROVERSY

The justiciability of plaintiff's claim inheres in the standing to sue that the Court has already found. Plaintiff seeks to protect the integrity and effectiveness of his vote. He claims that the refusal of the defendants to publish S. 3418 in reliance upon the Pocket Veto of the bill by the President has effectively nullified his vote. In order to decide plaintiff's claim it is necessary to determine the validity of the pocket veto of S. 3418 just as it was necessary in order to adjudicate the claims of the Indian tribes to determine the validity of the pocket veto in the *Pocket Veto Case*, supra, and in order to adjudicate the claim of David A. Wright to determine the validity of the return of the bill in the *Wright* case, supra.

In commenting upon the restriction of the jurisdiction of federal courts under Article III of the Constitution the Supreme Court stated in Flast v. Cohen, supra:

"Embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine." 392 U.S. at 94–95, 88 S.Ct. at 1949–1950.

The Court finds that this case meets those requirements.

Since as early as 1793, the restriction to "cases" and "controversies" has been accepted as imposing a rule against advisory opinions on federal courts. *Flast*, supra, note 14, at 96, 88 S.Ct. 1942. Plaintiff does not contest this settled Constitutional principle. In part, the rule against advisory opinions maintains the doctrine of separation of powers under the Constitution by avoiding unnecessary confrontations between the Judicial Branch and the Legislative or Executive Branch of the Government. Another reason for the rule against advisory opinions is to insure that suits before the federal courts are pressed ". . . with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests. . . ." Cf. United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 554, 5 L.Ed.2d 476 (1961).

By these standards, the complaint in this action clearly demonstrates that the requisite elements of a "case" or "controversy" are present within the meaning of Article III of the Constitution. Contrary to the suggestion in the defendants' Statement, plaintiff seeks no advisory opinion from this Court.

Plaintiff sponsored, supported, and voted for S. 3418 in the Senate. The action of the President in disapproving S. 3418 and the injury to plaintiff caused by the refusal of the defendants to perform their ministerial, nondiscretionary duties in reliance upon that action provide exactly the sort of clear concreteness, precise framing of questions, adversary argument, conflicting and demanding interests, and necessity for decision that have always been regarded as meeting the Article III requirement for the exercise of Federal judicial power.

## THE MERITS

Article I, Section 7, Clause 2 of the Constitution establishes a basic part of the procedure by which our laws are made. Its provisions allocate a dual responsibility to Congress and the President that is an important aspect of our system of checks and balances:

> "Every Bill which shall have passed the House of Representatives and the Senate shall, before it become a Law, be presented to the President of the United States. If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases, the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the

Same shall be a Law, in like Manner as if he had signed it, *unless the Congress by their Adjournment prevent its Return*, in which Case it shall not be a Law." (Emphasis added).

In effect, Article I, Section 7, Clause 2 contemplates four possible actions by the President when a bill passed by Congress is presented to him:

—The President may approve the bill by signing it within the ten-day constitutional period.

—The President may disapprove, or "veto" the bill by returning it to Congress with his objections within the ten-day period, in which case Congress has the opportunity to override the veto by a two-thirds vote in each House.

—The President may allow the bill to become a law without his signature at the end of the ten-day period.

—The President may disapprove the bill, by declining to sign it in circumstances where the adjournment of Congress "prevents" the President from returning the bill to Congress with his objections. In this last situation, the President is said to "pocket veto" the bill.

The issue on the merits of the present case is whether the Pocket Veto Clause of the Constitution is applicable in the circumstance of the Senate's 1970 Christmas recess. The specific question posed may be stated as follows:

Where a bill duly passed by both houses of Congress is submitted to the President of the United States pursuant to Article I, Section 7 of the Constitution of the United States and thereafter, during the same session of Congress, by mutual consent, the House of Representatives adjourned for a 6 day period and the Senate, in which the bill originated, adjourned for a 5 day period extending for 2 days beyond the 10th day the President had within which to sign or return the bill,[4] was the President *prevented*

---

4. If the intervening Sunday, December 27, 1970, is not counted, the period the House was in adjournment is 5 days and the period the Senate was in adjournment is 4 days and would extend for only one day beyond the 10th day the President had within which to sign or return the bill.

from returning the bill within the 10 day period where, prior to adjourning, the Senate designated its Secretary to receive messages from the President of the United States and its President pro tempore to sign duly enrolled bills during the adjournment.

█ This Court has concluded that the answer to that question is in the negative.

The question of when an adjournment of a House of Congress *prevents* the return of a bill under Article I, Section 7, Clause 2, has been before the Supreme Court on two occasions: Okanogan Indian Tribe et al. v. United States, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929) (the Pocket Veto Case), and Wright v. United States, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1937).

In the *Pocket Veto Case,* supra, Congress had approved an Act authorizing the Okanogan tribe and other Indian tribes in the State of Washington to pursue certain claims against the United States in the Court of Claims. On July 3, 1926, before the ten-day constitutional period for the President to consider the bill had expired, "the first session of the 69th Congress was adjourned." 279 U. S. at 672, 49 S.Ct. at 464. The President did not sign the bill nor return it to Congress, and the Indian tribes filed a petition in the Court of Claims alleging that the Act had become a law without the signature of the President. The issue before the Court was whether the Pocket Veto Clause applied only to final adjournments at the end of a Congress, or whether it also applied to adjournments at the end of a session of Congress. The Court, in an opinion by Mr. Justice Sanford, held that the clause applied to adjournments at the end of a session; that the adjournment prevented the return of the bill, and that therefore the bill had not become a law.

Nine years after the *Pocket Veto Case,* the Supreme Court again dealt with the scope of the President's veto power. In Wright v. United States, supra, the bill in question granted jurisdiction to the Court of Claims to hear the petitioner's claims against the United States. The bill had originated in the Senate, which was the House to which the President's objections would be returned if the bill were vetoed. After the bill, as passed by both Houses, had been presented to the President, the Senate adjourned for three days, while the House remained in daily session during the period. During the recess of the Senate, the President vetoed the bill, and the bill was returned with his objections to the Secretary of the Senate. When the Senate reconvened, the message of the President was read and the bill was referred to the Senate Committee on Claims, in effect sustaining the President's veto.

Subsequently, the petitioner, as the beneficiary of the private bill, brought an action in the Court of Claims alleging that the bill had become law, on the grounds (1) that there had been no adjournment of Congress within the meaning of the Pocket Veto Clause, since only the Senate had adjourned, and (2) that the President's return of the bill with his objections was not valid, since the Senate had not been in session on the day of the return, and, under the *Pocket Veto Case,* supra, a return could not be made to the Secretary of the Senate as an agent of the Senate.

Interpreting the Pocket Veto Clause and the other provisions of Article I, Section 7, Clause 2, the Supreme Court held, in an opinion by Chief Justice Charles Evans Hughes, that the bill had not become a law.

The Court held: (1) that since the House of Representatives was still in session, even though the Senate had adjourned for a brief period—there was no adjournment of "Congress" within the meaning of the Pocket Veto Clause of the Constitution as the reference to "The Congress" in the Constitution means the entire legislative body consisting of both Houses; (2) that in returning the bill to the Secretary of the Senate there was no violation of any express requirement of the

Constitution since that instrument does not define what shall constitute a return of a bill or deny the use of appropriate agencies in effecting the return; (3) that the three-day recess of the Senate did not "prevent" the President from returning the bill with his objections to the Senate, since the organization of the Senate continued and was intact and the Secretary of the Senate was available to receive the President's message; (4) that the fundamental purposes of the constitutional provisions are (a) to give the President suitable opportunity to consider the bills presented to him, and (b) to give the Congress suitable opportunity to consider his objections to bills and on such consideration to pass them over the veto if there are the requisite votes.

In reaching its conclusion in the *Pocket Veto Case,* supra, the Court emphasized that "the determinative question in reference to an 'adjournment' is not whether it is a final adjournment of Congress or an interim adjournment, such as an adjournment of the first session, but whether it is one that 'prevents' the President from returning the bill to the House in which it originated within the time allowed." 279 U.S., at 680, 49 S.Ct., at 467. In concluding that the adjournment at the end of a *session of Congress* prevented the return of the bill in question, the Court adopted the view that the provision in the Constitution, for the return of a bill to a House, is intended to refer to a *House in session,* and that a return could not be made to an officer or agent of a House while the House was not in session. 279 U.S. at 680–687, 49 S.Ct. 463. In this connection the Court also noted that Congress had never enacted a statute authorizing such a procedure nor were there any rules of Congress granting an authorization, and opined that the delivery of the bill to such officer or agent, "even if authorized by Congress itself, would not comply with the constitutional mandate." 279 U.S. at 684, 49 S.Ct. at 468.

The rationale for the Court's opinion was stated, in part, in the following language:

"Manifestly it was not intended that, instead of returning the bill to the House itself, as required by the constitutional provision, the President should be authorized to deliver it, during an adjournment of the House, to some individual officer or agent not authorized to make any legislative record of its delivery, who should hold it in his own hands for days, weeks or perhaps months,—not only leaving open possible questions as to the date on which it had been delivered to him, or whether it had in fact been delivered to him at all, but keeping the bill in the meantime in a state of suspended animation until the House resumes its sittings, with no certain knowledge on the part of the public as to whether it had or had not been seasonably delivered, and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid." 279 U.S. at 684, 49 S.Ct. at 468.

While this language of the Supreme Court appears at first blush to militate against this Court's conclusion, upon closer scrutiny it is clear that it does not. It must be kept in mind that the Supreme Court's language in the *Pocket Veto Case* applied to an adjournment *at the end of a session and not to a short recess during a session* where, as here, the Senate had specifically authorized its Secretary to receive messages from the President during the recess. Further, the subsequent opinion of the Court in the *Wright* case found the reasoning of the Court in the *Pocket Veto Case* to be inapposite to the circumstances of a case which involved a short temporary recess of the House in which the bill originated as distinguished from an adjournment of Congress at the end of a session. The following excerpts from the Court's opinion in *Wright* support the view of this Court.

In commenting upon the "House in session" view of the Court in the *Pocket Veto Case*, supra, the Supreme Court in Wright, stated:

"But that expression should not be construed so narrowly as to demand that the President must select a precise moment when the House is within the walls of its chambers and that a return is absolutely impossible during a recess however temporary. Such a conclusion . . . would frustrate the fundamental purposes of the constitutional provision as to action upon bills." 302 U.S. at 594, 58 S.Ct. at 400.

Referring to the rationale for the opinion in the *Pocket Veto Case*, mentioned herein previously, the *Wright* Court stated:

"These statements show clearly the sort of dangers which the Court envisaged. However real these dangers may be when Congress has adjourned and the members of its Houses have dispersed at the end of a session, the situation with which the Court was dealing, *they appear to be illusory when there is a mere temporary* recess." (Emphasis supplied). 302 U.S. at 595, 58 S.Ct. at 400.

Continuing, the *Wright* Court said:

"Each House for its convenience, and *during its session and the session of Congress*, may take, and frequently does take, a brief recess limited, as we have seen, in the absence of the consent of the other House, to a period of three days. In such case there is no withholding of the bill from appropriate legislative record for weeks or perhaps months, no keeping of the bill in a state of suspended animation with no certain knowledge on the part of the public whether it was seasonably delivered, no causing of any undue delay in its reconsideration. *When there is nothing but such a temporary recess the organization of the* House *and its appropriate officers continue to function without interruption, the bill is properly safeguarded for a very limited time and is promptly reported and may be reconsidered immediately after the short recess is over.* The prospect that in such a case the public may not be promptly and properly informed of the return of the bill with the President's objections, or that the bill will not be safeguarded or duly recorded upon the journal of the House, or that it will not be subject to reasonably prompt action by the House, is we think wholly chimerical." 302 U.S. 595, 58 S.Ct. 400. (Emphasis supplied).

Although the Supreme Court found support for its holding in *Wright* in Article I, Section 5, Clause 4, its reasoning in support of its determination that a short temporary recess of a House existing on the final day for the return of a bill while the Congress is in session does not "prevent" the President from returning the bill is clearly applicable to the facts and circumstances of this case. Here we have a short temporary recess of the Senate, in which the bill originated, during the session of Congress. The recess was consented to by the House of Representatives. Prior to the adjournment the Senate by unanimous vote designated its Secretary to receive any messages from the President. The Senate returned on the third day after the final day for the President to act. The interim two days would have caused no long delay in delivery of the bill; no keeping it in "suspended animation". In three days the public would have been promptly and properly informed of the President's objections, and the purposes of the constitutional provisions would have been satisfied. Under these circumstances

"(T)here is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in presenting a bill to the President by sending it to

the White House in his temporary absence. Such a presentation is familiar practice. The bill is sent by a messenger and is received by the President. It is returned by a messenger, and why may it not be received by the accredited agent of the legislative body? *To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right."* 302 U.S. 590, 58 S.Ct. 398. (Emphasis supplied).

In the instant case the Senate was in a short temporary recess extending at most for two days beyond the 10th day the President had within which to act. Its organization and appropriate officers continued to function without interruption. Indeed, the Senate specifically designated its Secretary to receive any messages from the President. Just as none of the dangers envisaged by the Court in the *Pocket Veto Case* were present in *Wright,* none are present here. *Under the facts of this case the Senate could have adjourned at the close of business on December 24, 1970, until December 28, 1970, without the consent of the House of Representatives and such adjournment would not have prevented the President from returning the bill.* This fact places this case squarely within the rationale of Wright. The circumstance that the recess began on December 23 with the consent of the House of Representatives in no way detracts from that conclusion. What is to be considered is not the time when the recess began but whether the House was in a recess on the tenth day that prevented the President from returning the bill.

As previously noted the two fundamental purposes of Article I, Section 7 of the Constitution are (a) to give the President suitable opportunity to consider the bills presented to him, and (b) to give the Congress suitable opportunity to consider his objections to bills and on such consideration to pass them over the veto if there are the requisite votes.

As to the first of these purposes there can be no question in this case that the President had such opportunity and availed himself of it. In a Memorandum of Disapproval, dated December 24, 1970, one day before the expiration of the time allowed for his consideration, and released December 26, 1970, the President stated that he was withholding his signature from the bill and gave his reasons therefor.

As to the second fundamental purpose, the Senate returned from the recess on December 28, 1970. It did not adjourn *sine die* until January 2, 1971. There was ample opportunity to consider the President's objections to the bill and on such consideration to pass it over the veto provided there were the requisite votes. To find that the President's action in this case was a valid pocket veto would require the adoption of a construction that would frustrate the second of these purposes, contrary to the holding of the Supreme Court in *Wright,* 302 U.S. 583, 596, 58 S.Ct. 395, 82 L.Ed. 439.

The plaintiff has urged the Court to hold that the Pocket Veto Clause is applicable only to *sine die* adjournments and not to any adjournments within a session. Such a holding is not necessary for the determination of this case and this Court declines to swim in waters that the Supreme Court pointedly avoided in *Wright.* Cf. 302 U.S. at 598, 58 S.Ct. 395. All that is determined here is that the short recess of the Senate in this case, extending only two days beyond the ten day period the President had to sign or disapprove the bill, did not *prevent* the return of the bill to the Senate in which it originated. It follows therefore that the pocket veto was

invalid and S. 3418 became a law without the signature of the President, in accord with Article I, Section 7, Clause 2 of the Constitution.

Based upon the foregoing the Court concludes that there is no genuine issue of a material fact and that plaintiff is entitled to a judgment as a matter of law.

### ORDER

This matter having come before the Court on plaintiff's motion for summary judgment and defendants' motion to dismiss or, in the alternative, for summary judgment, and the Court having considered the pleadings, motions, and statements filed by the parties and having heard oral argument and having filed a memorandum opinion herein and having found that there is no genuine issue as to any material fact, and concluded that plaintiff is entitled to a judgment as a matter of law, it is this 15th day of August, 1973, hereby

Ordered, Adjudged and Decreed:

1. That plaintiff's motion for summary judgment be and it is hereby granted, and that defendants' motion to dismiss or, in the alternative, for summary judgment is denied.

2. That the Family Practice of Medicine Act, S. 3418 (91st Congress, 2d Session) became a law of the United States on December 25, 1970, in accord with Article I, Section 7, Clause 2 of the Constitution, and defendants are under a ministerial, nondiscretionary duty to publish said law in accordance with the provisions of 1 U.S.C. § 106a, 1 U.S.C. § 112 and 1 U.S.C. § 113.

3. This Court retains jurisdiction and the matter of the issuance of an injunction restraining the defendants from failing and refusing to publish S. 3418 as a law of the United States in accord with the provisions of 1 U.S.C. § 106a, 1 U.S.C. § 112 and 1 U.S.C. § 113 will be held in abeyance until September 19, 1973, on which date the defendants shall report to this Court at 10:00 a. m. the action taken by them to comply with the declaratory judgment entered herein.